In re the MARRIAGE OF Larry
Harold WEGNER and Joan
Alice Wegner,

Upon the Petition of Larry Harold
Wegner, Appellant,

And Concerning

Joan Alice Wegner, Appellee.

No. 86–1752.

Supreme Court of Iowa.

Dec. 21, 1988.

Pat W. Brooks of Brooks, Ward & Trout, Marshalltown, for appellant.

Ted Hoglan of Fairall, Fairall & Kaplan, Marshalltown, for appellee.

McGIVERIN, Chief Judge.

In this dissolution of marriage action, the trial court awarded respondent Joan Alice Wegner permanent alimony to be paid by petitioner Larry Harold Wegner in the amount of $350 per month. Larry appealed the award and the case was transferred to the court of appeals which reduced the award to $150 per month. We granted Joan's application for further review and now affirm the decision of the court of appeals. Accordingly, we modify the judgment of the trial court.

I. *Background facts and proceedings.* Because dissolution of marriage proceedings are tried in equity, our review is de novo. *In re Marriage of Vrban,* 359 N.W. 2d 420, 423 (Iowa 1984); Iowa R.App.P. 4. Thus, weight is accorded the findings of fact by the district court, but we are not bound by these findings. Iowa R.App.P. 14(f)(7).

Larry and Joan were married June 12, 1960. They separated after 26 years. At the time of the dissolution proceeding Larry was 46 and Joan was 45 years of age. Both were in relatively good physical and mental health. Larry and Joan have two children. The youngest was age 18 at the time of the trial. Larry was ordered to pay $200 per month child support and that is not an issue in the appeal.

Larry has earned a high school diploma. In the early years of the marriage he

worked at a variety of jobs. In 1984 Larry opened a service station in Marshalltown and continued to make his living from this enterprise throughout these proceedings. He also operated a small salvage yard for automobile parts. The district court found that Larry had the capacity to earn a gross annual income of approximately $20,000. The parties do not dispute this finding.

Joan has also earned a high school diploma and has worked in a number of different jobs throughout the marriage. In 1974, Joan began working at a meat packing plant in Marshalltown where she continued to work for the next ten years. When she left the meat packer, Joan was earning $8.95 per hour. Her last job was boxing picnic hams and various meats on special order. Some dispute exists concerning the circumstances involved in motivating Joan's decision to voluntarily leave this employment.

Joan contended that she and Larry had separated in 1985 and, in an effort toward reconciliation, she complied with Larry's request that she quit work and help him operate the service station. Larry contended that Joan had quit because she had long planned she would do so when she completed ten years with the company and partial pension benefits vested. In either event, the reconciliation proved to be short lived and the couple separated for the final time in July 1985.

Shortly thereafter, Joan began work in a popcorn packaging plant. At the time of the dissolution proceeding, Joan was earning $3.65 an hour from this employment. Had Joan returned to the meat packing plant where employment was available, her hourly wage would have been between $5.00 and $6.00. She would not have been entitled to the seniority she had previously acquired. Because of the wage reduction and because Joan was concerned with the effect of the working conditions at the meat packing plant on her health, Joan accepted the lower paying popcorn plant job. Based upon the rate of income that Joan received from the popcorn plant, the district court found that Joan had the ca-

pacity to earn a gross annual income of approximately $8,000.

In regard to permanent alimony, the district court ruled that "in light of the parties' present financial circumstances" Larry was obligated to pay Joan $350 in monthly alimony payments. It was ordered that this obligation would continue until Joan remarried or died, or until Larry died. Larry appealed this decision contending that the award of alimony was unwarranted and, even if warranted, it was excessive. The case was transferred to the court of appeals. *See* Iowa R.App.P. 401(a).

The court of appeals modified the award, holding the district court erred in neglecting to recognize the opportunity available to Joan to work at the meat packing plant for a higher wage than she earned at the popcorn plant. The court of appeals found that Joan voluntarily refused to return to the meat packing plant, a job that would have afforded her a minimum annual salary of $11,000. Therefore, the court of appeals modified the district court award, reducing the alimony obligation to $150 monthly.

Joan filed an application for further review, contending the court of appeals erred in determining her earning capacity and reducing the alimony award. The application was granted and, upon further review, we affirm the decision of the court of appeals.

II. *Earning capacity of the recipient spouse.* Alimony is an allowance to one spouse in lieu of the other's legal obligation for support. *In re Marriage of Sjulin,* 431 N.W.2d 773, 775 (Iowa 1988); *In re Marriage of Hitchcock,* 309 N.W.2d 432, 437 (Iowa 1981). In *Schantz v. Schantz,* 163 N.W.2d 398, 405 (Iowa 1968), we identified "[e]arning capacity of each party" as among the considerations in making an equitable determination of financial obligations of the parties to a dissolution of marriage action. *See also Hitchcock,* 309 N.W.2d at 436–37; *In re Marriage of Estlund,* 344 N.W.2d 276, 281 (Iowa App. 1983).

We have consistently examined the earning capacity of the payor spouse beyond simply ascertaining present income. *See In re Marriage of Wahlert*, 400 N.W.2d 557, 560–61 (Iowa 1987) (payor husband should not pursue unprofitable farming operation when he could earn more as a laborer); *In re Marriage of Horstmann*, 263 N.W.2d 885, 890–91 (Iowa 1978) (in determining division of property, court could consider the future earning potential of husband who had received law degree and was admitted to the bar); *Ellis v. Ellis*, 262 N.W.2d 265, 267–68 (Iowa 1978) (holding in modification action that husband's alimony obligation was a function of his earning capacity rather than the amount of his voluntarily reduced income).

◼ Correspondingly, when we look to the amount of permanent alimony a payee spouse should receive, if any, we must consider not simply present income, but his or her earning capacity as directed by Iowa Code section 598.21(3). That section states in part:

> Upon every judgment of ... dissolution ..., the court may grant an order requiring support payments to either party for a limited or indefinite length of time after considering all the following:
> ....
> e. *The earning capacity of the party seeking maintenance,* including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. *The feasibility of the party seeking maintenance becoming self-supporting* at a standard of living reasonably compared to that enjoyed during the marriage, and the length of time necessary to achieve this goal.

Iowa Code § 598.21(3)(e), (f) (1987) (emphasis added).

Thus, the legislature has recognized that support after the marriage is dissolved is a two-way street. When a marriage is dissolved, neither party usually has as much money available for self support as was true before the breakup. Also, prior plans as to support may have to be abandoned. Consequently, both parties, if they are in reasonable health, need to earn up to their capacities in order to pay their own present bills and not lean unduly on the other party for permanent support.

◼ Such is the case here. The parties here are not affluent people but both are capable of working to support themselves. Larry's earning capacity in the service station is limited. The court of appeals decision, that Joan had an earning capacity of $11,000 and a job available in which to earn that amount, was reasonable and equitable under the record. She should have assisted herself by earning up to her capacity. This is especially true after the breakup, even though she might have to take a job she did not prefer. *Cf. Wahlert*, 400 N.W. 2d at 561 (payor should take a non-preferred job); *Ellis*, 262 N.W.2d at 267 (holding in modification proceeding that payor spouse could not reduce his obligation by taking voluntary retirement stating that "obligations in and apart from family life compel many persons to maintain employment which may be difficult, undesirable and even physically or mentally painful.")

We believe the decision of the court of appeals concerning permanent alimony for Joan was more consistent with the intent of the legislature set forth in Iowa Code section 598.21(3)(e) and (f) than the judgment of the trial court.

III. *Disposition.* The amount of permanent alimony for Joan was fixed at a proper amount by the court of appeals. The decision of the court of appeals is affirmed and the judgment of the trial court is modified accordingly.

DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED AS MODIFIED.

All Justices concur except HARRIS, NEUMAN, SNELL and ANDREASEN, JJ., who dissent.

HARRIS, Justice (dissenting).

Although I do so with great respect I vehemently protest the harsh manner in which the majority treats this appellee. I dissent because the majority sends out three signals which are clear, startling and absolutely wrong.

I. It is true that we have paid the specified respect to a de novo review standard in family law cases. *See* Iowa Code section 242.4 (1987). So doing, we have heretofore accorded more than passing deference to trial court findings, especially in matters of property division, awards, and allowances. *Yansky v. Yansky*, 172 N.W.2d 114, 117 (Iowa 1969) ("trial court has considerable discretion").

This deference was grounded in wise public policy. These determinations are more apt to be just when the objective facts are squared with the judge's subjective impressions, gained from close personal observations. One who personally observes holds a clear advantage over us who learn the case from a cold record. The first-hand observer can translate that advantage into a more just disposition. It is not in the public interest for appellate courts to strain to seek out fine-tune adjustments in these matters.

More litigants are harmed than helped when we fail to give real weight to trial court findings. This is because litigants will feel we have been too enthusiastic in inviting them to seek review. They will do so because of our demonstrated proclivities to intermeddle unduly in matters which at the bottom are judgment calls. The total cost to the parties—and the public—of this increased appellate activity is appalling. Any net gain in just results is highly conjectural, as is strikingly illustrated by the present case. Substantially more benefit would result to all litigants if we were hesitant to meddle with speculative judgment calls of this nature.

II. It seems that Joan was guilty of a tragic blunder some years ago when she undertook ten years of grueling work in a packing plant. It was not work which she enjoyed. Both she and Larry agreed that her employment would last only for ten years, the point at which her modest retirement benefits became vested. Those benefits, in an unspecified amount, will not be received until some future date.

When she left her job at the packing plant, as planned and with Larry's approval,[1] she lost all seniority rights and gave up a job which paid $8.85 per hour. If she returned there, it would be for $5.00 to $6.00 per hour.

In determining Joan's earning capacity the majority, disagreeing with the trial court, points to Joan's ten-year effort at the packing plant and, in economic effect, converts it to a life sentence. Under the circumstances this is inordinately unfair. Joan should no more be committed to work at a packing plant than would any person her age who had never previously done so. The holding will almost certainly precipitate a host of claims that alimony should be fixed on the basis of what a spouse, Joan's age, could earn at a packing plant, or at the most grueling work a former spouse might suggest.

There is every indication that Joan's earnings at the packing plant were used, as I assume Larry's earnings at the time were, for family expenses. The practical effect of the majority holding is starkly unjust. Joan's only incentive for working at the plant for ten years was to gain retirement benefits. But the majority transfers any advantage from those benefits from Joan to Larry by reducing his alimony obligations at once by $200. It seems almost certain that the amount of reduction in alimony over the years will greatly exceed the total amount of retirement benefits to be realized.

The lesson of the majority holding is crystal clear. A person should hesitate long before making the sort of ten-year sacrifice Joan undertook. Even though the effort is undertaken unselfishly and with a

1. Larry himself testified that the work at the plant was too hard for Joan and, because of that and pay cuts under the union contract, Joan worked only until the ten years were up. He suggested she quit and go to work for him.

clear agreement about its limits, a person making the effort will be drawn into a permanent obligation.

III. Finally, I dissent because the trial court's modest award of $350 per month was just and fair and the majority's award of a paltry $150 a month is plainly not. The parties were married 26 years. Both worked hard to defray family expenses. Larry's earning capacity greatly exceeds Joan's. The majority holds that the trial court was wrong in fixing at $350 per month alimony to be paid by a person earning $20,000 annually. It dismisses Joan at her age after all her efforts with $150 per month. This is plain, dead wrong.

NEUMAN, SNELL and ANDREASEN, JJ., join this dissent.