# IN THE COURT OF APPEALS OF IOWA

No. 15-0489
Filed November 25, 2015


**IN RE THE MARRIAGE OF PAUL J. BRAUN
AND CAROL J. BRAUN**

**Upon the Petition of
PAUL J. BRAUN,**
        Petitioner-Appellant,

**And Concerning
CAROL J. BRAUN,**
        Respondent-Appellee.
_____


        Appeal from the Iowa District Court for Plymouth County, John D. Ackerman, Judge.


        Paul Braun appeals the spousal support provision of the dissolution decree. **AFFIRMED AS MODIFIED.**


        Dennis R. Ringgenberg of Crary, Huff, Ringgenberg, Hartnett & Storm, P.C., Sioux City, for appellant.

        Debra S. De Jong of De Jong Law Firm, P.C., Orange City, for appellee.


        Heard by Mullins, P.J., McDonald, J., and Scott, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**SCOTT, Senior Judge.**

Paul Braun appeals the spousal support provision of the dissolution decree. He contends the court's order that he pay Carol Braun traditional alimony of $1000 per month is inequitable. We do not disturb the amount of the alimony awarded. However, we modify the decree to the extent that alimony will terminate at Paul reaching the age of sixty-seven, or Carol's remarriage or death, whichever first occurs. We award appellate attorney fees to Carol.

**I. Background Facts and Proceedings.**

Paul and Carol were married in 1992. They have three children—nineteen-year-old N.B., eight-year-old L.B. and six-year-old J.B. Paul filed for divorce on October 1, 2013. The parties remained living in the marital home with the minor children until January 2015, at which point Carol moved into a rental unit. The dissolution trial was held on February 19, 2015. The parties submitted a stipulation concerning all issues but spousal support and attorney fees. The parties agreed they would share physical care of the minor children. Paul would pay child support in the amount of $394 per month based upon his Wells Blue Bunny annual income of $69,427. He also would pay for the health insurance for the children. The parties agreed they would sell the marital home and equally divide the net proceeds; however, Carol would receive $21,000 from Paul's proceeds to offset his keeping his equipment, machinery, and tools he used for his electrical business (valued at $40,000-$50,000).

Paul testified that since 2005 he has worked at Wells Blue Bunny in a maintenance tech position "troubleshoot[ing] electrical/mechanical on the production machines." He works Monday through Friday from 7:00 a.m. to 5:00

p.m. and makes $25.55 per hour.[1] Paul's gross income from Wells in 2014 was $69,427.68.[2] Paul testified he started to do side electrical work in 2010. His tax returns indicate his electrical business earned $22,525 in 2010; $28,515 in 2011; $39,464 in 2012; and $61,809 in 2013. Paul stated he performed his final contract electrical work in 2014, grossing $40,699. He acknowledged he has performed some non-contract electrical work in addition to finishing up the pre-contracted work. He testified that although he kept the machinery and equipment from his electrical business, he did not plan to do further electrical side work. According to the child support guideline worksheet, Paul's net monthly income was $4191.62. He testified his monthly expenses were $4691.50. Paul's listed expenses include a duplicated $394 deduction for child support, $238 per month for daycare (which is already factored into the calculation for net monthly income, *see* Iowa Ct. R. 9.5(10)), and his voluntary payments of N.B.'s college expenses of $676 per month. Paul stated he could not afford to pay spousal support.

Carol testified she graduated from high school and attended a one-year post-high school program. She has a diploma as a medical secretary. She has worked throughout the marriage: from 1992-1995, as a full-time secretary for an insurance company. She stated she moved to part time when N.B. was born. She worked from 1995 to 2009, as a secretary for another insurance company earning fifteen dollars per hour when she left. From 2009 to the time of trial, Carol worked as an office manager at Happy Siesta Health Care Center where

---

[1] This schedule began October 2014. He is paid for forty-seven hours per week. Prior to the change in October, his hours were 5:00 a.m. to 3:30 p.m.

[2] We note this appears to be based on the prior schedule of 52.5 hours per week (52.5 hr X 52 X 25.55= $69,751.5), rather than the current hours and pay rate Paul testified to (47 hr X 52 wks X $25.55=$62,444.20).

her supervisor is Paul's mother. She earns $15.67 per hour. She testified, "It's part-time and I'm still part-time. I work 30 to 32 hours a week." However, she stated she intended to ask for more hours and would "try to get 40 hours."[3] Carol testified her monthly expenses totaled $2864.90 per month while her net monthly income, including child support of $394 per month, totaled $2321.38. She testified Paul was driving a new vehicle, while she was driving an older model minivan that was in need of repair, which she could not afford.

The trial court found Carol was "fully capable of working [forty] hours a week." It also found,

> While it is commendable that Paul now wants to spend more time with his children and has obtained an agreement that he be awarded joint physical care, the Court still finds his voluntary decision to terminate his electrical business was done with the intent to lower his child support and potential alimony obligation.

The court did not enter a specific finding of Paul's earning capacity, but wrote:

> The Court must determine whether Paul has the financial ability to pay an alimony award and, if so, what amount would be appropriate.
> Although the Court does not only believe it is appropriate to require Paul to return to his electrical business at the same level that he had in prior years, it is clear to the Court that Paul can still earn a fairly significant amount of money in his electrical business at a work level significantly less than what he had before he closed the business. Such a requirement would still allow Paul to be with his children on the weeks that he has the children. He can still work his days off and the weekends when he does not have the children.
> As noted earlier, the Court finds that Carol is also currently underemployed. She is fully capable of working 40 hours a week.

---

[3] Carol was asked why she had not asked for more hours earlier. She responded, "Because up until January of this year, Paul and I were still living together. I was still primarily in charge of getting the kids to and from school, to and from day care, leaving when they were sick to get them home or to the doctor." Carol also testified that until October 1, 2014, Paul worked from 5 a.m. to 3:30 p.m.

A significant portion of Paul's estimated future monthly expenses are related to his voluntary support of NB. Paul does not have a legal obligation to support NB. Therefore, the Court does not consider any of the voluntary payments made by Paul to or on behalf of Paul to be considered in the determination of an appropriate alimony award. As noted, the parties had agreed to a child support determination based on only his income from Wells. However, if the Court were to take into consideration Paul's voluntary payments to or on behalf of NB in determining his ability to pay alimony that would result in Paul essentially being able to pick which dependents are to receive his financial support. Under Paul's plan, he favors NB over Carol and resultantly the two minor children. This is simply inappropriate.

Therefore, taking into consideration all of the facts and circumstances that exist in this case and applying them to the legal principles set forth above, the Court finds and concludes that it is appropriate to award Carol traditional alimony in the amount of $1000 per month until she remarries, cohabits, or either party dies.

Paul appeals, contending the spousal support order was "both oppressive and inequitable in both its duration and amount."

## II. Standard of Review

We review this equity action involving the dissolution of a marriage de novo. Iowa R. App. P. 6.907. We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us. Iowa R. App. P. 6.904(3)(g). "In reviewing questions related to spousal support, while our review is de novo, we have emphasized that we accord the trial court considerable latitude. We will disturb the trial court's order only when there has been a failure to do equity." *In re marriage of Gust*, 858 N.W.2d at 406 (Iowa 2015) (citations and internal quotation marks omitted). As our supreme court emphasized in *Gust*,

"This deference to the trial court's determination is decidedly in the public interest. When appellate courts unduly refine these important, but often conjectural, judgment calls, they thereby foster

appeals in hosts of cases, at staggering expense to the parties
wholly disproportionate to any benefit they might hope to realize."

*Id.* at 407 (quoting *In re Marriage of Benson*, 545 N.W.2d 252, 257 (Iowa 1996)).

**III. Discussion.**

Spousal support is not an absolute right—it depends upon the
circumstances of a particular case. *In re Marriage of Schenkelberg*, 824 N.W.2d
481, 486 (Iowa 2012). The court may grant an award of spousal support after
consideration of all the factors contained in Iowa Code section 598.21A(1)
(2013).[4] *Gust*, 858 N.W.2d at 407.

"Traditional spousal support is often used in long-term marriages where
life patterns have been largely set and 'the earning potential of both spouses can

---

[4] Section 598.21A(1) provides:

Upon every judgment of annulment, dissolution, or separate
maintenance, the court may grant an order requiring support payments to
either party for a limited or indefinite length of time after considering all of
the following:
a. The length of the marriage.
b. The age and physical and emotional health of the parties.
c. The distribution of property made pursuant to section 598.21.
d. The educational level of each party at the time of marriage and
at the time the action is commenced.
e. The earning capacity of the party seeking maintenance,
including educational background, training, employment skills, work
experience, length of absence from the job market, responsibilities for
children under either an award of custody or physical care, and the time
and expense necessary to acquire sufficient education or training to
enable the party to find appropriate employment.
f. The feasibility of the party seeking maintenance becoming self-
supporting at a standard of living reasonably comparable to that enjoyed
during the marriage, and the length of time necessary to achieve this
goal.
g. The tax consequences to each party.
h. Any mutual agreement made by the parties concerning financial
or service contributions by one party with the expectation of future
reciprocation or compensation by the other party.
i. The provisions of an antenuptial agreement.
j. Other factors the court may determine to be relevant in an
individual case.

be predicted with some reliability."' *Id.* at 411 (citing *In re Marriage of Francis*, 442 N.W.2d 59, 62–63 (Iowa 1989)). In *Gust*, our supreme court observed that our case law "demonstrates that duration of the marriage is an important factor for an award of traditional spousal support." *Id.* at 410. A common "durational threshold" to "merit serious consideration for traditional spousal support" is twenty years. *Id.* at 411. The length and amount of an award of "traditional alimony is primarily predicated on need and ability." *Id.* (citing *In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998)). The standard for determining need is an objective standard and is measured "based upon the predivorce experience and private decisions of the parties, not on some externally discovered and imposed approach to need, such as subsistence or adequate living standards or amorphous notions of self-sufficiency." *Id.* "In determining need, we focus on the earning capability of the spouses, not necessarily on actual income." *Id.* Where the disparity in earning capacity is great, awards both of alimony and substantially equal property distribution have been affirmed. *Id.*

We consider the property distribution and spousal support provisions of a decree together to determine their sufficiency. *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). Spousal support is justified when the distribution of the marital assets does not equalize the inequities and economic disadvantages suffered in marriage by the party seeking the support, and there is a need for support. *Id.* While the property distribution is designed to sort out property interests acquired in the past, spousal support is made in contemplation of the parties' future earnings and is modifiable. *Id.* at 59–60. The spouse

receiving spousal support is expected to earn up to their capacity. *See In re Marriage of Wegner*, 434 N.W.2d 397, 399 (Iowa 1988).

Here, the parties were married for twenty-two years. At the time of the dissolution proceedings, both were forty-four years old and in good physical health. However, Carol takes medication for her anxiety and panic disorders. The district court adopted the parties' stipulation, equally dividing the marital property—each receiving approximately $235,000 plus proceeds when the marital home is sold, which will incorporate an equalization payment to Carol. The court found and the record supports a finding that Carol's imputed earning capacity is approximately $31,000 per year.

Paul graduated from high school and attended a three-year power line program at a technical college. He was self-employed as an electrician from 1996 to 2003. In 2009, he attained a Master Class "B" electrical license, which requires at least 16,000 working hours in the field and eight years of electrical experience. *See id.* § 598.21A(1)(d). He maintained an electrical business in addition to his employment from 2010 to 2014, and he maintains his continuing education requirements. Paul's dissolution stipulation includes his keeping the equipment and machinery for his electrical business. His earning capacity is at least $69,427,[5] though he has shown he is capable of earning almost twice that. The difference between Paul's minimum earning capacity and Carol's imputed

---

[5] This was his income solely from Wells prior to his voluntary change of hours in October 2014.

earning capacity is $38,427. Thirty-one percent of the difference is $11,912.[6] *See Gust*, 858 N.W.2d at 412 ("We have, however, approved spousal support where it amounts to approximately thirty-one percent of the difference in annual income between spouses.").

It is unlikely Carol will ever be able to generate enough income to support herself in the style the parties lived during the marriage. *See* Iowa Code § 598.21A(1)(f) (listing "[t]he feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal" as a factor to be considered when ordering support payments (emphasis added)). "The purpose of a traditional . . . alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997). The trial court's order that Paul pay $1000 per month in spousal support does not fail to do equity. We, like the district court, reject Paul's complaint that he is not able to afford the support order, particularly in light of his erroneous monthly expense claims and voluntary reduction in his Wells earnings.

Paul also argues that the duration of the award of support—until Carol remarries, cohabits, or either party dies—is unreasonable. In considering duration of a spousal support award, "traditional spousal support is ordinarily unlimited in duration except upon the remarriage of the payee spouse, or death of either party." *Gust*, 858 N.W.2d at 415 (citing *In re Marriage of Cooper*, 451

---

[6] We specifically disavow any suggestion the trial court made that the court will require a parent to work a second job in addition to a full-time position. However, we uphold the spousal support order based solely upon Paul's income from his Wells employment.

N.W.2d 507, 509 (Iowa Ct. App. 1989); *In re Marriage of Bornstein*, 359 N.W.2d 500, 503 (Iowa Ct. App. 1984); *In re Marriage of Hayne*, 334 N.W.2d 347, 351 (Iowa Ct. App. 1983)). This is not a case where we can find a period of retraining would allow Carol to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage. *See Gust*, 858 N.W.2d at 415 (allowing unlimited spousal support where "there is no reason to believe [former spouse] will ever be able to generate enough income to support herself at the standard of living she enjoyed during the marriage"). *Cf. In re Marriage of Becker*, 756 N.W.2d 822, 827 (Iowa 2008) (limiting spousal support in a twenty-two year marriage where after a period of rehabilitation and retraining, the income of the payee spouse "should allow her to become self-supporting at a standard of living reasonably comparable to the standard of living she enjoyed during the marriage"). We note the *Gust* court discussed the propriety of tying the termination of spousal support to retirement age. *See Gust*, 858 N.W.2d at 412-14, 416-18. The *Gust* majority wrote,

> Our most recent case dealing with retirement benefits in the context of traditional spousal support is *In re Marriage of Michael*, 839 N.W.2d [630,] 632, 638 [(Iowa 2013)]. In this case, a sixty-three-year-old payor spouse sought modification of a prior spousal support order. *Id.* at 632. Among other things, the district court modified the order to provide that spousal support should terminate when the payor spouse reached the age of sixty-seven. *Id.* The court of appeals reversed. *Id.* at 634. We sided with the court of appeals on this issue. *Id.* at 634, 640. We held that the question of whether the payor spouse's obligation should terminate at his retirement "will depend on the circumstances of the parties prevailing at that time." *Id.* at 639 n.8. Thus, the payor spouse in *In re Marriage of Michael* was required to wait until actual retirement to seek a reduction in his spousal support payments through a modification action based upon the impact of his retirement on his ability to pay.

858 N.W.2d at 412-13. The majority found that following the approach of *Marriage of Michael* was the best course in many instances. *Id.* at 416. However, we are not convinced that approach is appropriate here.

In *Gust*, the court observed:

> Our resolution is also consistent with ALI's Principles of the Law of Family Dissolution, which suggest in an illustration that unlimited traditional spousal support is presumptively appropriate in thirty-year marriages where the claimant is fifty-five years of age, but not for a twenty-year marriage where the claimant was forty years of age. Principles of the Law of Family Dissolution § 5.06, at 949–50. Here, Linda was fifty-two years of age when the decree was entered and the marriage lasted nearly twenty-seven years, just shy of the facts presented in the ALI illustration that presumptively qualified for unlimited spousal support and well away from the facts of the illustration where only term support was merited. In this case, even if Linda was not entitled to unlimited spousal support under the ALI framework, the length of her definite term spousal support under section 5.05 according to an illustration would entitle her to support for seventeen years, or to age sixty-nine. *See id.* § 5.05, at 939–40.

858 N.W.2d at 421 n.2.

Here, Carol is forty-four, not fifty-two. *See id.* The Brauns' marriage lasted twenty-two years (not twenty-seven as in *Gust*), which is several years shy of the thirty-year marriage the ALI Principles suggest warrant lifetime support. *See id.* Under these circumstances, we conclude spousal support shall terminate upon Paul reaching retirement age of sixty-seven, or Carol's remarriage or death, whichever first occurs.[7] *See id.* at 414.

---

[7] In *Gust* the court observed:
There is also authority for the proposition that traditional spousal support may terminate upon reaching retirement. In *In re Marriage of Anliker,* 694 N.W.2d 535, 539 (Iowa 2005), the district court imposed an award of traditional spousal support until the payee attained the age of sixty-five or either party dies. While the limitation was not challenged on appeal, we found the traditional spousal support so limited was "equitable and [therefore, it] should not be disturbed." *Id.* at 541; *accord In re*

**IV. Appellate Attorney Fees.**

Carol asks the court to award her appellate attorney fees. Appellate attorney fees are not a matter of right, but rather rest in this court's discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). Factors to be considered in determining whether to award attorney fees include: "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). Carol was ordered to pay her own trial attorney fees, which were substantial, and has been forced to defend the spousal support award here, expending in excess of $6600 in attorney fees. Paul has been minimally successful. We award Carol $5000 in appellate attorney fees.

Costs of the appeal are taxed to Paul.

**AFFIRMED AS MODIFIED.**

---

*Marriage of Soloski,* No. 05–0310, 2006 WL 623583, at *2, 3–4 (Iowa Ct.App. March 15, 2006) (holding spousal support which terminated when payor reached age sixty-five equitable as to amount and duration); *In re Marriage of Aronson,* No. 05–0373, 2006 WL 334250, at *3–5 (Iowa Ct.App. Feb. 15, 2006) (holding termination of spousal support when payor reached age sixty-five equitable where fifty-one-year-old wife received one-half of payor's retirement benefits at that time).
858 N.W.2d at 414.