# IN THE COURT OF APPEALS OF IOWA

No. 19-1256
Filed August 5, 2020

IN RE THE MARRIAGE OF JACQUELYN SCHULTZ
AND JOEL SCHULTZ

Upon the Petition of
**JACQUELYN SCHULTZ,**
        Petitioner-Appellee,

**And Concerning**
**JOEL SCHULTZ,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Buchanan County, Monica L. Zrinyi

Wittig, Judge.

        Joel Schultz appeals from the decree dissolving his marriage.  **AFFIRMED**

**AS MODIFIED.**

        Benjamin M. Lange of Swisher & Cohrt, P.L.C., Independence, for

appellant.

        Timothy D. Ament of Timothy D. Ament Law Firm, P.L.C., Waterloo, for

appellee.

        Considered by Tabor, P.J., and May and Greer, JJ.

**GREER, Judge.**

The district court dissolved the twenty-seven-year marriage of Jacquelyn and Joel Schultz in 2019. Joel appeals certain factual findings made by the district court and argues for an entitlement to spousal support. Jacquelyn found the decree acceptable and asks that we affirm. We review the issues raised by Joel.

**I. Background Facts and Proceedings.**

The parties married in February 1992 and separated in January 2017. At the time of trial, Joel was sixty years old and Jacquelyn was fifty-one years old. The trial occurred in May 2019, but Joel applied for temporary spousal support and received $4000 per month from December 2018 until the June 2019 decree was entered. The district court determined that spousal support was "not appropriate," made several factual findings Joel now disputes, and divided the marital assets. With the assets divided, the district court required Joel to pay an equalization payment to Jacquelyn of $125,000. Joel asked the court to reconsider the ruling, and the district court denied his motion. Joel appeals only the denial of spousal support.

As is often the case, the facts developed by Jacquelyn and Joel at trial diverged. Facts undisputed were that after separation Joel moved to the family vacation home in Wabasha, Minnesota, and Jacquelyn remained in the family home in Winthrop, Iowa. They spilt the real estate in that same manner. Then to help resolve other disputed matters, the parties stipulated to the marital asset and debt values and the intended designee. Except for determining the values of a boat and a motor, the district court's charge was to decide whether an award of spousal support was warranted. In determining whether spousal support was

appropriate, the district court found the following facts. Two months after the marriage, Jacquelyn graduated from college with a Bachelor of Arts degree in psychology. She returned to college in 2006, graduating in 2008 with a master's degree in social work. Jacquelyn testified that because she worked full-time and applied for a loan forgiveness program, no marital monies were used to pay for her master's education. Jacquelyn worked outside the home at various jobs throughout the marriage, except for an eight-month maternity leave after the birth of one of their two children.[1] In 2011, Jacquelyn formed her own counseling service where she remains as a mental-health therapist treating clients along with other therapists in her employ. Her income climbed after this employment change. At the time of trial, Jacquelyn reported gross income of around $14,000 per month.

As for Joel's income, the parties conceded that for most of the years of the marriage Joel was the primary income earner. For background, Joel graduated with an associate degree in science. Because of an injury to his arm,[2] Joel now receives Social Security disability (SSD) benefits and is unemployed. Before the injury, Joel's last employment involved an eighteen-year stint as a retail territory manager for a food broker making $52,000 annually. That job ended with a layoff in May 2017 after a buyout of the company, for which Joel received nineteen weeks of severance pay. For many years before the food-broker job, Joel worked for a major grocery store, and the family relocated several times for his employment advances. Joel described both long-term jobs as requiring manual labor, which he

---

[1] No dissolution issues are impacted by these adult children.
[2] Joel fell at a restaurant, injuring his shoulder in March 2017. Disability benefits began in March of that year. After two years, he qualifies for Medicare health benefits.

can no longer do. At trial, the established SSD monthly payment to Joel equaled $2249 per month and his disability insurer paid him $470 per month in disability benefits. Shortly before trial, Joel's insurer alerted him that the monthly long-term disability policy payment would terminate in July because they found that Joel could be employable in some job even if it different from his last job. He planned to appeal that determination. Joel also reasoned that when he reaches age sixty-seven, his SSD ends and he will receive a smaller regular social security benefit, which will be $100 less than he is currently receiving.

With the spousal-support question at the forefront, Joel focused on the goals of his retirement plan. Joel described his retirement plan as one that he and Jacquelyn supported. Jacquelyn disagreed. As for the age disparity of the couple, Jacquelyn, at age fifty-one, will work another sixteen years producing income where Joel, at age sixty, is near retirement age. For the twenty-six years working at a grocery store in various roles—both before and during the marriage—Joel and his employer contributed to a retirement plan. While married, but after starting the retail manager job in 2001, Joel and Jacquelyn used the retirement monies from the employment with the grocer to fund the down payment and some improvements on the Winthrop home purchase. After paying the early withdrawal penalty and taxes, only half of the $190,000 balance of retirement funds were available to use. Under the current plan, Joel would retire at age seventy and one-half years to maximize his retirement plan benefits. To reach his goal, he contributed maximum earnings to the retirement accounts while working at the food brokerage company. His plan involved allowing those retirement funds to appreciate to a value of one million dollars when he reached age seventy and a

half. Under Joel's plan, at that point, the couple could access the funds for retirement and start investing more of Jacquelyn's earnings. At trial, his retirement account equaled $593,920.

We address Joel's claims that certain factual findings made by the district court were in error and that he was entitled to spousal support.

## II. Standard of Review.

A trial involving the dissolution of a marriage is an equitable proceeding. Iowa Code § 598.3 (2018). As a result, our review is de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 484 (Iowa 2012). While we give weight to the factual determinations made by the district court; its findings are not binding upon us. Iowa R. App. P. 6.904(3)(g).

When we review questions of spousal support, in our de novo review, we still "accord the trial court considerable latitude." *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005) (quoting *In re Marriage of Spiegel*, 553 N.W.2d 309, 319 (Iowa 1996)); *see also Schenkelberg*, 824 N.W.2d at 486. And we will disturb the trial court's findings "only when there has been a failure to do equity." *Olson*, 705 N.W.2d at 315 (quoting *Spiegel*, 553 N.W.2d at 319).

## III. Analysis.

**A. Were There Errors in the Factual Findings?** Joel claims these facts from the decree are in error: (1) "no marital money was expended for [Jacquelyn's] education"; (2) Jacquelyn's net income is $9805 per month; (3) Joel's retirement account is large because "his disposable income was diverted into the investment as opposed to being used by the parties"; (4) Joel should be able to work in the field of sales despite his social security administration disability determination; (5)

that the Wabasha real estate had rental income potential; (6) an award of alimony to Joel would require Jacquelyn to increase her monthly earnings given the new tax laws; (7) after Joel pays the balance of the furniture and boat loans his monthly expenses will be "almost non-existent"; and (8) the current asset distribution allows Joel to realize his retirement plan. We address each factual finding separately, but we realize that we need not correct every perceived error in the district court's findings of fact. "Since this is an equity case in which our review of both facts and law is de novo . . . we need not separately consider these assignments. We do not reverse an equity case upon such complaints as these but draw such conclusions from our review as we deem proper." *Lessenger v. Lessenger*, 156 N.W.2d 845, 846 (Iowa 1968).

1. *"No marital money was expended for [Jacquelyn's] education."* The completion of Jacquelyn's bachelor's degree preexisted the marriage. But, because there is no question Jacquelyn achieved her master's degree during the marriage, we assume Joel provided some means to support that effort. "[M]arriage does not come with a ledger." *Fennelly*, 737 N.W.2d 97, 103 (Iowa 2007). Likely each party contributed in ways financially and non-financially in this long-term marriage. For purposes of our analysis, we assume that Joel, in the years he was the primary provider, supplied economic resources, although not direct payments to the educational costs, to help Jacquelyn achieve her goals.[3]

2. *Jacquelyn's net income is $9805 per month.* Jacquelyn agreed at trial that her income was "at least $14,115.66 per month." Joel arrived at that figure by

---

[3] At a minimum, Jacquelyn accessed Joel's health insurance benefits through his employer.

averaging Jacquelyn's reported business income for the years 2015, 2016, and 2017. Joel promulgated confusion by claiming that the number represents net income, when, in fact, the sum represents the gross income earned in those years. So the district court determined:

> Petitioner's salary is reported on her financial affidavit as $14,166.00 per month, but this does not take into consideration her operating expenses. She incurs on average, a monthly obligation for operating and other expenses in the amount of $4,361.00 leaving her a net of $9,805.00.

After a review of the parties' tax returns, we agree with the finding of the district court and find the net income attributable to Jacquelyn equals $9805 per month.

3. *Joel's retirement account is large because "his disposable income was diverted into the investment as opposed to being used by the parties."* Joel concedes the increased contributions of disposable income to his retirement account but resists the characterization of that effort as being "diverted" funds. He opines the term carries a negative connotation. Instead, he emphasizes that the goal to increase contributions was a joint plan and retirement strategy. Jacquelyn disagrees that it was part of her plan. But in this review, the enhanced funding is a reality and we only need address how it plays with the request for spousal support. Motive is a part of a history we may never know.

4. *Joel should be able to work in the field of sales in spite of his social security administration disability determination.* Without contest, the parties agreed that the Department of Social Security Disability determined that Joel was disabled from an injury he sustained after falling. And the court found that Joel "was on disability and essentially retired." Joel described a shoulder injury that caused him throbbing pain while working on a computer for no longer than an hour.

He testified his condition limited any return to his previous line of work that required some manual labor. Noting that no one offered medical testimony or medical reports supporting Joel's descriptions, the court offered that no medical support for Joel's testimony was provided, no testimony explained whether recovery was ongoing over the past two years since injury, and only Joel opined he could no longer be a salesperson. Likewise, the court said, "The Court has no idea what [Joel] earned in sales or what his bonus schedule may have been as the Court was not provided his tax records prior to his injury." The court also found that Joel intended to retire at the time of his injury in any event and so it was unlikely he would have sought future employment even without having fallen.

Interestingly, during the trial, the district court observed Joel and made factual findings that "he has mobility in his arm and shoulder, especially when he demonstrated his movement to the Court. The Court is not clear how the shoulder injury would prevent him from future work in the field of sales." One role of the factfinder is to assess the credibility of the witness on the witness stand by observing the witness's conduct and appearance. *Ruden v. Peach*, 904 N.W.2d 410, 413 (Iowa Ct. App. 2017) (finding trial court improperly "became a witness" by relying on matters outside the trial record). The line between factfinder and witness can be crossed where observations by the judge are the basis for a finding on a disputed fact that must be proved and corroborated. *See Dworkis v. Dworkis*, 111 So. 2d 70, 74 (Fla. Dist. Ct. App. 1959) ("The effect of a trial judge's observation of a party's manner and demeanor in the court room should be limited to its bearing on the credibility to be accorded to the party's testimony given under oath; and such observations by the judge should not be the basis for findings by

the court on disputed facts, to the contrary of that party's position, because in so doing a judge may be said to have made himself a witness, unsworn and not cross-examined."). Here, we have no basis for evaluating the court's evaluation of Joel's condition as there is no record of what he did or how he used his body from which to assess the findings. Without the medical evidence the district court seemed to seek, it instead made medical findings about a party. That left Joel with no opportunity to cross-examine, offer countervailing evidence, or know upon what evidence the court relied when making its decision.

Jacquelyn argues that despite the court's observations, it never veered from the conclusion that Joel received social security payments based on a disability and could only receive SSD earnings. What is unclear from the record is what impact the court's observations of Joel's functioning played in the spousal support decision.[4] Because no one challenges the disability finding and no one countered with vocational choices for Joel or what earnings he might reap, on this record we find it would be unlikely for Joel now with his shoulder injury to earn what he made at the height of his career.

5. *The Wabasha real estate had rental income potential.* Joel disputes the district court's finding that the Wabasha home had rental income potential. Apparently, based on past tax returns, the parties did recognize income from

---

[4] In the ruling on the posttrial motion, the court stated:
> The Court rendered its findings from the tax records and personal observations in the courtroom. [Joel] also indicated his status as a recipient of disability was coming on for review. The Court cannot speculate as to what that might mean for him, but the Court viewed a man capable of participating in trial, communicating with confidence and moving without severe limitation.

renting the lake home. But Joel's point is well taken here; if the Wabasha house serves as his primary residence, the rental opportunity is unrealistic.

6. *An award of alimony to Joel would require Jacquelyn to increase her monthly earnings given the new tax laws.* Addressing tax ramifications and spousal support, the court noted, "With the new tax laws and the effect such has on alimony, [Jacquelyn] will have to increase her current income to meet a present day value to pay any alimony in order to maintain her business and her expenses." Joel asserts the court erred by concluding that if Jacquelyn paid spousal support the new tax laws impacting deductibility of the payment would require Jacquelyn to increase her income. The practical impact of the tax changes is that there is an increased cost to the payor when a payment of spousal support is ordered. *In re Marriage of Mann*, 943 N.W.2d 15, 21 (Iowa 2020) (addressing the greater economic impact of paying spousal support on the payor because of changes in tax law deductibility). The payor pays the support amount and cannot deduct the payment on the tax return, so the payor is effectively taxed on the amount. But we address tax considerations, along with other factors, as a part of the overall fairness analysis if we determine spousal support is warranted. Iowa Code § 598.21A(1)(g). The district court's comments about tax laws do not impact our overall de novo review of the factual findings.

7. *After Joel pays the balance of the furniture and boat loans his monthly expenses will be "almost non-existent."* We acknowledge that this comment "cherry picked" out of the decree is not an accurate reflection of Joel's monthly expenses. Joel assumed the boat loan ($15,906.32 total with a $726.20 monthly

payment) and the furniture loan ($1208.77 with a$197 monthly payment).[5] From his financial affidavit, Joel has other monthly expenses but these loans will be satisfied in short order. We consider the reasonable expenses of both parties as developed in this record.

8. *The current asset distribution allows Joel to realize his retirement plan.* Much of the trial revolved around Joel's retirement concerns. He rejects the district court's conclusion the property distribution, which Joel did not appeal, solved his retirement goals. The court noted "[n]ow that awards of assets are made in this decree, [Joel] will be able to commence planning for distribution from his retirement account as was his plan given his station in life." After an equalization payment to Jacquelyn of $125,000, Joel netted assets of $597,910. The $125,000 payment would be transferred from Joel's retirement plan monies of $593,920, leaving him $468,920 in that account. On the other side of the ledger, Jacquelyn received net assets valued at $365,599. Joel did not appeal this property award.

We recognize and agree that Joel's plan to accumulate $1 million dollars before accessing the retirement monies at age seventy and one-half years was not achieved. Jacquelyn denies participation in the planning and instead noted that Joel's testimony referenced only "my goal" and "my plan." And with the dissolution of the marriage, it is not unrealistic to expect that previous goals and plans might require modification.

We next address Joel's spousal support request.

---

[5] Debt balances come from Jacquelyn's financial affidavit.

**B. Was Joel entitled to an award of spousal support?** In the history of this marriage, Joel carried the mantle of primary breadwinner for many years of the union. Now he is on the verge of his retirement years, and Jacquelyn arguably has another decade or more in the labor market. After this long-term marriage and with the disability Joel experiences, he argues that spousal support is mandated under these facts. He lobbies for a payment of $4391.46 per month to support his pre-dissolution lifestyle. While the length of this marriage meets the durational threshold used to consider a spousal award, our inquiry does not stop there. *See In re Marriage of Gust*, 858 N.W.2d 402, 410–11 (Iowa 2015) (concluding marriages lasting over twenty years "merit serious consideration for traditional spousal support").

But the central question comes down to the analysis of need and ability to pay. *Id.* at 411. The "yardstick" for determining need is whether the spouse can "become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.'" *Id.* (citation omitted); *see also* Iowa Code § 598.21A(1)(f). We also review the earning capability of the spouses, not necessarily just the actual income. *See In re Marriage of Wegner*, 434 N.W.2d 397, 399 (Iowa 1988) ("We have consistently examined the earning capacity [of the parties] beyond simply ascertaining present income."). We also look at the case avoiding a prism defined by gender. Generally the historical record of the spouse's earnings provides a starting point to determine earning capacity, but we only have a one-year history for Joel and a three-year history for Jacquelyn. With little evidence about Joel's earning capacity, we are left with testimony and a review of the 2017 joint tax return. We glean that Joel receives SSD of $2249 plus

a long-term insurance disability payment of $470, which may or may not be continued. And there was no vocational rehabilitation information about any return to work given his disability. On the flip side, the tax returns support Jacquelyn's three years of substantial earnings in her counseling endeavor, with a monthly average gross income of $14,115. The disparity between earnings equals $11,396 each month.

Yet "[s]pousal support 'is not an absolute right, and an award thereof depends upon the circumstances of a particular case.'" *Schenkelberg*, 824 N.W.2d at 486 (citation omitted). Those important circumstances are incorporated into a statutory checklist of factors to review. Those factors relevant here include: (a) length of the marriage, (b) the age and physical and emotional health of the parties, (c) the property distribution, (d) the education level of each party, (e) the earning capacity of the party seeking maintenance, including educational background, training, employment skills and work experience, (f) the feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and (g) tax consequences to each party. *Id.*; *see also* Iowa Code § 598.21A(1). Our cases applying the statute have identified three kinds of support: traditional, rehabilitative, and reimbursement. *See In re Marriage of Becker*, 756 N.W.2d 822, 826 (Iowa 2008); *In re Marriage of Francis*, 442 N.W.2d 59, 63–64 (Iowa 1989). The categories may overlap in some cases. *See, e.g.*, *Becker*, 756 N.W.2d at 827 (involving spousal support award the court could not characterize as strictly rehabilitative or traditional). Traditional spousal support is often used in long-term marriages where "life patterns have been largely set, [and] the earning potential of both parties can be predicted with

some reliability." *Francis*, 442 N.W.2d at 62–63; *see also In re Marriage of Kurtt*, 561 N.W.2d 385, 388 (Iowa Ct. App. 1997). "The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997).

Under the statutory checklist, the length of this marriage meets the threshold period for an award of spousal support. *See Gust*, 858 N.W.2d at 411. Next, at trial, Joel was sixty years old and Jacquelyn was fifty-one years old. Both parties are well educated but Jacquelyn has attained a master's degree. And while the parties acknowledged that Joel served as the primary breadwinner for many years of the marriage, he now is disabled and out of the workforce. In contrast, Jacquelyn has moved into the peak of her career, with another sixteen years of earning power until reaching a traditional retirement age of sixty-seven. Turning to the property division, the district court found that given Joel's "current circumstances" he should receive most of the retirement account. Joel received about 63.9% of the net marital assets, leaving Jacquelyn with 36.1%. Generally in marriages of long duration, the property award is substantially equal. *Id.* With retirement savings now equaling $468,920, Joel only has his SSD income to meet expenses and will be required to dip into that savings. If required to pay spousal support, Jacquelyn suggested at trial that she would rather transfer more assets to Joel than be saddled with a monthly alimony payment.[6] And it appears the

---

[6] The court noted Jacquelyn would forgo her half share in Joel's retirement plan to avoid an alimony payment.

district court heeded that proposal. But even with the disparate award favoring Joel, Jacquelyn improves her ability to live at the lifestyle the parties maintained.

The district court considered the couple's lifestyle and said this:

> The Court did not receive any information about the family's lifestyle. The Court did not hear about expensive family vacations. The Court did not hear about expensive or elaborate homes or vehicles. The family carried balances on loans for larger purchases. There was no testimony offered to indicate that either gambled, over imbibed or haphazardly spent money. They seemed to enjoy time in Wabasha. It can be gleaned that the Petitioner enjoys horses and Respondent enjoys fishing. Both will be able to continue these recreational pursuits given the division of the assets herein."

We recognize the trial court was in the best position to balance the parties' needs, and we should intervene on appeal only where there is a failure to do equity. *See Olson*, 705 N.W.2d at 315. Arguments for spousal support for Joel are (1) his disability, (2) his age of sixty years, and (3) Jacquelyn's substantial earnings. The compelling argument against a spousal support award to Joel is the award of 63.9% of the parties' property. "We consider alimony and property distribution together in assessing their individual sufficiency. They are neither made nor subject to evaluation in isolation from one another." *Hettinga*, 574 N.W.2d at 922.

Because Joel received a greater share of the marital property, it is important to weigh that factor against his request for spousal support. Indeed, Jacquelyn's earnings allow her to afford a spousal support award. Her financial affidavit estimated her monthly expenses at $2591.17. In an earlier filed affidavit, Joel first described his monthly expense at $1727.42 but then at trial provided a more detailed statement showing expenses of $6839.32 per month. Jacquelyn opined

the estimate was high.[7] Thus, when we access the "yardstick" of whether Joel can achieve a standard of living reasonably comparable to that enjoyed during the marriage, even with the greater balance of assets in his pocket, we do not believe he can. Unlike the district court, we find the evidence supports a comfortable lifestyle with two homes, boats, and the ability to save significant monies for retirement. And while Joel can access the retirement monies to support his lifestyle, Jacquelyn will support her lifestyle without having to reduce her net worth. Thus, Joel makes a compelling argument that Jacquelyn can afford to help support that similar pre-dissolution lifestyle for him. *See Hettinga*, 574 N.W.2d at 922 (noting that spousal support "provide[s] the receiving spouse with support comparable to what he or she would receive if the marriage continued.").

Noting that there is no magic formula for calculating spousal support, we look to the specific facts of the case and apply the statutory factors addressing the award. *Mann*, 943 N.W.2d at 20. With consideration of those factors, including the property award and the potential tax consequences to the parties, we award Joel spousal support of $2500 per month until he reaches age seventy. After that date, the spousal support shall be reduced to $1500 per month and the spousal support obligation shall terminate when either party dies or Joel remarries.

## IV. Disposition.

We affirm the district court dissolution order as modified in this opinion.

**AFFIRMED AS MODIFIED.**

---

[7] Jacquelyn offered that Joel would soon qualify for Medicare/Medicaid and the $910 health insurance premium would no longer be an expense. She also pointed to two loans (the boat and the furniture), that would be satisfied soon, again reducing Joel's monthly obligations.