# IN THE COURT OF APPEALS OF IOWA

No. 20-0068
Filed May 12, 2021

IN RE THE MARRIAGE OF SHIRLEY A. FLAHERTY
AND JEFFREY B. FLAHERTY

Upon the Petition of
SHIRLEY A. FLAHERTY,
      Petitioner-Appellee,

And Concerning
JEFFREY B. FLAHERTY,
      Respondent-Appellant.

_____

Appeal from the Iowa District Court for Cerro Gordo County, Colleen D.

Weiland, Judge.

Jeffrey B. Flaherty appeals from an award of spousal support and certain

economic provisions of a dissolution decree. **AFFIRMED AS MODIFIED.**

Gregg Geerdes, Iowa City, for appellant.

Donald E. Esser of Esser Law Firm, PLC, Mason City, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**SCHUMACHER, Judge.**

Jeffrey Flaherty appeals from an award of spousal support and certain economic provisions of a dissolution decree, including the approval of a Qualified Domestic Relations Order (QDRO), the amount of the cash settlement to offset Jeffrey's receipt of personal property, and the award of attorney fees. Upon our de novo review, we find it equitable to affirm the monthly amount of spousal support but modify its duration. We reduce the property equalization payment to reflect the agreement recited on the record. We affirm the other provisions of the dissolution decree. We decline to award appellate attorney fees.

**I.      Facts & Prior Proceedings**

At the time of the dissolution of marriage in late 2019, Jeffrey and Shirley Flaherty had been married for twenty-six years. Shirley was fifty-one years old and Jeffrey was fifty-three years old. They have two adult sons who were twenty-six and twenty-nine. Both of their sons are self-sufficient.

Before the marriage, Jeffrey graduated from high school and earned his bachelor's degree from the University of Northern Iowa in 1989. Shirley graduated from high school and then completed a ten-month secretarial certification program. After receiving her certificate, she worked as a secretary and part-time at a pizza restaurant where she met Jeffrey, who was the restaurant manager.

Jeffrey and Shirley married in 1993. Early in the marriage, Jeffrey worked primarily as a sales representative, working for various companies, including a multi-level marketing company, a car dealership, and a water treatment system company. Early in the marriage, Shirley primarily stayed at home with the children when they were young. Shirley worked from the home, starting her own childcare

business and doing other side jobs such as landscaping, property management, house cleaning, and multi-level marketing.

In 1999, Jeffrey obtained employment at Kraft Heinz, and the parties moved from Minnesota to Mason City. They have lived in Mason City since and in the marital home for approximately the last fifteen years. During the marriage, the parties lived within their means, accumulating little debt and enjoying a comfortable lifestyle. Their sons were involved in extracurricular activities such as band, choir, and traveling sports. They vacationed about once per year. Jeffrey and Shirley supported their sons through college.

At the time of trial, Jeffrey had been employed at Kraft Heinz for approximately twenty years. Jeffrey started at Kraft Heinz as a team member working on the factory floor. He worked his way up to his current position in logistics, where he is responsible for the long-term planning and scheduling of the manufacturing lines. Jeffrey's employment at Kraft Heinz affords him a 401(k) plan, a pension plan, and a health savings account. His salary in 2018 was $81,690.

Jeffrey finds the obligations of his employment stressful. He consistently works fifty to sixty hours per week. The recent merger between Kraft and Heinz has made his job more demanding, with fewer employees in the logistics department and the introduction of new products. Jeffrey feels the stress from his job has negatively affected his health. He suffers from anxiety and high blood pressure. He has received medical treatment for these conditions and takes medication to address his symptoms. He is also a cancer survivor. His cancer is in remission.

The parties also operated a successful eBay business from the home, buying and selling collectible farm toys. The business began in 2005, and Jeffrey spent approximately four hours per day on the eBay business. Shirley also contributed daily to this business. In recent years, the parties reported about $500,000 in revenue and $35,000 in pre-tax income from the business per year.

At the time of trial, Shirley had worked for the Mason City School District for approximately eighteen years, where she has been a para-educator working with children with developmental needs. Shirley is in good health. Her employment is an hourly position, and she works thirty-five hours per week during the school year. Her pay is distributed pro-rata over the calendar year. During the summer, she provides custodial services for the school. Her summer employment pays roughly fifteen dollars per hour. During the summer, she can set her own schedule and has typically worked thirty hours per week. Through her employment with the school district, she receives health insurance and Iowa Public Employees' Retirement System (IPERS) benefits. Shirley has also worked part-time at Target in the photography department. The job pays thirteen dollars an hour, and her hours are flexible, allowing her to choose the number of hours she wants. In the past, she worked about sixteen hours per week; however, she was not currently working at Target at the time of trial.

The parties separated in May 2018. Shirley filed her petition seeking a dissolution of marriage from Jeffrey on August 14, 2018. Trial was held on July 25, 2019, and the district court entered its decree on September 30. The district court's decree required that Jeffrey pay spousal support to Shirley in the amount of $1000

per month, with spousal support terminating "upon either party's death, or upon [Shirley's] remarriage or romantic cohabitation."

Shortly after the court entered its decree, both parties filed motions pursuant to Iowa Rule of Civil Procedure 1.904. The district court issued its ruling on the motions on December 19. Jeffrey appealed.[1] Jeffrey argues the district court acted inequitably in awarding Shirley $1000 per month in traditional spousal support and believes short-term spousal support in a lesser amount is more appropriate. Jeffrey also takes issue with certain economic provisions of the property distribution. Finally, Jeffrey contests the award of attorney fees to Shirley.

On March 10, 2020, subsequent to Jeffrey filing his initial appeal, Shirley submitted a proposed QDRO, which the court approved. On March 23, Jeffrey filed an objection, and the order was vacated. On April 9, following an unrecorded hearing, the district court issued an order re-approving the QDRO. Jeffrey also appealed this order.[2] A motion to consolidate the two appeals was filed May 5, and the two pending appeals have been consolidated into the present appeal.[3]

## II. Standard of Review.

We review dissolution proceedings de novo. Iowa R. App. P. 6.907; *In re Marriage of Becker*, 756 N.W.2d 822, 824–25 (Iowa 2008). We give weight to the factual findings of the district court, especially when considering the credibility of

---

[1] Jeffrey filed his initial appeal arising from the dissolution decree and subsequent rule 1.904 ruling on January 13, 2020. This appeal was designated Supreme Court No. 20-0068. Shirley did not appeal.

[2] Jeffrey filed his appeal arising from the QDRO order on April 13, 2020. This second appeal was designated Supreme Court No. 20-0611.

[3] The two appeals have been consolidated into the instant appeal, No. 20-0068.

witnesses, but are not bound by them. Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007).

## III.    Analysis.

### A.    Spousal Support

Whether to award spousal support lies in the discretion of the district court. *In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015); *Becker*, 756 N.W.2d at 825. "[W]e accord the trial court considerable latitude in making th[e] determination [of spousal support] and will disturb the ruling only when there has been a failure to do equity." *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005) (citation omitted).

In awarding spousal support of a limited or indefinite length, the district court is required to consider the statutory factors enumerated in Iowa Code section 598.21A (2018). These factors include: (1) the length of the marriage; (2) the age, physical, and emotional health of the parties; (3) the property division; (4) the educational level of the parties at the time of the marriage and at the time the dissolution action is commenced; (5) the earning capacity of the party seeking support; (6) the feasibility of the party seeking support becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage; and (7) the tax consequences to each party. Iowa Code § 598.21A.

The factors are not to be considered in isolation but together within the context of the entire record and each case's particular facts and circumstances. *Gust*, 858 N.W.2d at 408; *Becker*, 756 N.W.2d at 825–26; *In re Marriage of Miller*, 532 N.W.2d 160, 162 (Iowa Ct. App. 1995) ("[Spousal support] is not an absolute right; an award depends upon the circumstances of each particular case.").

Jeffrey argues for a reduction in both the duration and the amount of spousal support. He does not urge a complete elimination of the spousal support award. Jeffrey requests this court reduce Shirley's spousal support award to $600 per month for a period of two years. Upon our de novo review, in order to do equity between Shirley and Jeffrey, we leave the monthly amount of the spousal support award undisturbed but modify the duration of the spousal support ordered by the district court to a period of five years, based on the analysis that follows.

The district court awarded Shirley what is characterized as "traditional" spousal support—supposal support of $1000 per month to "terminate upon either party's death, or upon [Shirley's] remarriage or romantic cohabitation." *See Gust*, 858 N.W.2d at 415 (explaining "traditional spousal support is ordinarily unlimited in duration except upon the remarriage of the payee spouse, or death of either party"). "The purpose of a traditional or permanent [spousal support] award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *Id.* at 408 (citation omitted).

In marriages of long duration, "[t]he imposition and length of an award of traditional [spousal support] is primarily predicated on need and ability." *Id.* at 411 (alteration in original) (citation omitted); *see also In re Marriage of Hitchcock*, 309 N.W.2d 432, 436–37 (Iowa 1981). Need is measured by the ability of a spouse to become self-sufficient at "a standard of living reasonably comparable to that enjoyed during the marriage." Iowa Code § 598.21A(1)(f); *accord Gust*, 858 N.W.2d at 411 (noting the standard is "objectively and measurably based upon the predivorce experience and private decisions of the parties"). The court considers

each party's earning capacity and each party's present standard of living and ability to pay balanced against the relative needs of the other. *See id.* at 411–12.

As a threshold matter to our analysis, we begin with the length of the marriage. Because the "life patterns" and economic consequences of marriage become more significant as the marriage continues, the duration of the marriage is an important first factor in considering an award of traditional spousal support. *Id.* at 410; *In re Marriage of Francis*, 442 N.W.2d 59, 63–64 (Iowa 1989). At the time of the dissolution, Jeffrey and Shirley had been married for twenty-six years, warranting consideration of traditional spousal support. *See Gust*, 858 N.W.2d at 410–11 (explaining that generally speaking, "marriages lasting twenty or more years commonly cross the durational threshold" for consideration of traditional spousal support).

We turn next to the amount of support awarded. The district court assigned an expected net monthly income of $2110 for Shirley and $5025 for Jeffrey, leaving a disparity of income of $2915.[4] The court found the disparity warranted an award of support in the amount of $1000—roughly thirty-four percent of the income disparity between the spouses. *See id.* at 411 (indicating financial disparity weighs in favor of an award of spousal support). Additionally, the court found that because both parties will likely continue to earn income at roughly the same level going forward, the support should continue indefinitely. While "we do not employ a

---

[4] We note the district court's order does not precisely explain how it arrived at this calculation; however, we find it reasonable given the parties' reported historical incomes and will defer to the court's imputation for our purposes here. *See Gust*, 858 N.W.2d at 411 ("In marriages of long duration, the historical record ordinarily provides an objective starting point for determining earning capacity of persons with work experience.").

mathematical formula to determine the amount of spousal support," it should be appropriately tailored to address and remedy any inequities resulting from the marriage. *Id.* at 411–12; *In re Marriage of Geil*, 509 N.W.2d 738, 742 (Iowa 1993); *In re Marriage of Grady-Wo*ods, 577 N.W.2d 851, 853–54 (Iowa Ct. App. 1998).

The amount of the award as a proportion of the disparity in income between the parties in the present case is likely within the bounds of our prior case law. *See Gust*, 858 N.W.2d at 412 (upholding an award equal to thirty-one percent of income disparity and noting awards in similar amounts). However, recent changes in federal income tax laws, and our supreme court's observation of the impact of these changes on previously upheld awards in similar amounts, warrant consideration. *See In re Marriage of Mann*, 943 N.W.2d 15, 21 (Iowa 2020) (noting that under the Tax Cuts and Jobs Act of 2017, spousal support payments are non-deductible and payments received are non-taxable income, making "the economic impact of [spousal support] on the paying spouse is greater today than it has been in the past" and specifically observing that "if the case were before us today on the same facts, a 31% award [as affirmed in *Gust*, 858 N.W.2d at 412,] would have a larger impact on the payor spouse . . . because of the tax change").

With this in mind, we turn to the duration of the support. At the outset, we note that both parties will have to at least initially accept a lower standard of living than what was enjoyed during the marriage. *See In re Marriage of Wegner*, 434 N.W.2d 397, 399 (Iowa 1988) ("When a marriage is dissolved, neither party usually has as much money available for self-support as was true before the breakup."). Each party will bear the costs and burdens of maintaining a single household.

Additionally, it is not expected that the eBay business and income derived from it will continue, resulting in a loss of roughly $35,000 in income.

Traditional spousal support is payable for life or for so long as the dependent spouse is incapable of self-support. *See Grady-Woods*, 577 N.W.2d at 854. "Spousal support may end, however, where the record shows that a payee spouse has or will at some point reach a position where self-support at a standard of living comparable to that enjoyed in the marriage is attainable." *Gust*, 858 N.W.2d at 412; Iowa Code § 598.21A(1).

"In order to limit or end traditional support, the evidence must establish that the payee spouse has the capacity to close the gap between income and need or show that it is fair to require him or her alone to bear the remaining gap between income and reasonable needs." *Gust*, 858 N.W.2d at 412. Earning capacity is not necessarily dictated by actual income. *See id.* at 411; *Wegner*, 434 N.W.2d at 398–99 ("We have consistently examined the earning capacity of the [parties] beyond simply ascertaining present income.").

In determining the earning capacity of Shirley, the district court assigned an expected future income roughly equal to her current level and found it appropriate that support continue indefinitely because it was unlikely she would ever earn more. The court noted that Shirley is "very happy" at her current job and "appreciates the good benefits it offers," and the court found that "[f]orgoing marginally increased wages to maintain the significant retirement and health benefits available through the school district is not insensible."

Our supreme court recently affirmed a complete denial of spousal support to a spouse whose education and historic earnings were substantially less than his

spouse, finding that he was content with the less strenuous and more convenient work and that the modest employment left him with ample free time that he could have used to expand his economic prospects or domestic contributions. *Mann*, 943 N.W.2d at 17–22.

Keeping the amount of the support undisturbed, we find it unfair for Jeffrey alone to shoulder the burden of remedying the gap between Shirley's future income and needs indefinitely. This is particularly true when to accomplish the same would require Jeffrey to work over sixty hours per week, with Shirley working approximately half that amount. Here, the disparity in earning capacity between Shirley and Jeffrey is not entirely a result of Shirley sacrificing more lucrative employment for the marital enterprise or to enable Jeffrey's career advancement. Rather, a portion must be attributed to personal preference and for the type of work Shirley enjoyed. While it appears Shirley was the primary caregiver to the children before they reached school age, once the children were out of the house, Shirley choose to forgo employment opportunities with higher earning capacities because she preferred the accommodations her work at the school district provided.

At the time of the dissolution, both children had been out of the house for approximately fifteen years. Shirley had been working for the school district for approximately eighteen years. At trial, Shirley testified that she has no intention of leaving her job. She stated, "I feel safe there and secure so I would like to stay employed there at least until the age of 65 if I am well able."

Shirley testified that in the past she considered other types of employment, including careers in nursing, landscaping, and interior design. She stated that she considered going back to school or receiving training to pursue these careers, but

uncertainty around whether she would enjoy school, the IPERS benefits offered through the school district, and her love of children kept her at her current job. She explained, "I love kids. And I—I don't think you should have to put a price on enjoying your job. Sure, I could go get a part-time job and work some more hours. But I shouldn't have to quit a job that I love." Shirley considered becoming a teacher, which would offer the same benefits and the ability to work with children; however, she explained that, "Sure, I'd love to be a school teacher, but I don't want the headaches that go along with it. I like to leave at 3:30 and not to worry about meetings . . . ."

In the past, Shirley worked at jobs that offered the prospect of higher earning capacity. She worked at Kraft Heinz part-time for approximately one-and-one-half years before quitting, finding the work difficult and unenjoyable. Shirley acknowledges the availability of more lucrative jobs and that she is still capable and qualified to perform them; however, she does not believe the possibility of higher earning capacity outweighs the non-economic benefits of her current employment.

We recognize Shirley's preference to work only until 3:30 p.m. and the flexibility to set her own hours in the summer. However, for the purposes of awarding spousal support, it is equitable, under some circumstances, to assign earning capacity based on more lucrative employment for which the spouse is qualified but does not prefer. *See Wegner*, 434 N.W.2d at 398–99 (affirming a court of appeals decision holding that the district court erred in neglecting to recognize the opportunity available to a spouse seeking maintenance to work at a meat-packing plant for a higher wage than earned at a popcorn plant that she

preferred); *In re Marriage of Wahlert*, 400 N.W.2d 557, 560–61 (Iowa 1987) (holding payor husband should not pursue unprofitable farming operation when he could earn more as a laborer); *see also Ellis v. Ellis*, 262 N.W.2d 265, 267 (Iowa 1978) (stating "obligations in and apart from family life compel many persons to maintain employment which may be difficult, undesirable and even physically or mentally painful").

It is important that every person balance the fulfillment and compensation of employment; however, following dissolution, we do not find it equitable for Jeffrey to subsidize Shirley's preference for the remainder of his life. Also important in considering an award of spousal support is the obligation placed on the payor spouse balanced against their needs and ability to pay. "[B]oth parties, if they are in reasonable health, need to earn up to their capacities in order to pay their own present bills and not lean unduly on the other party for permanent support." *Wegner*, 434 N.W.2d at 399.

Jeffrey worked throughout college and earned his degree before the marriage. It is apparent Jeffrey has exhibited a strong work ethic throughout the marriage. Shirley acknowledged, "[Jeffrey] has worked 60 hours at Kraft for 20 years. He has done an eBay business seven days a week, a minimum of four hours a day." Jeffrey started out as a team member at Kraft Heinz, receiving the lowest offered pay. He worked his way from the floor of the factory to his current managerial position. However, Jeffrey reports significant stress from his job and believes it has negatively affected his health.

Further support to the reduction in the length of spousal support is the sizable equalization payment Shirley is to receive as a part of the property

distribution.[5] "We consider [spousal support] and property division together in assessing their individual sufficiency. They are neither made nor subject to evaluation in isolation from one another." *In re Marriage of McLaughlin*, 526 N.W.2d 342, 345 (Iowa Ct. App. 1994); *In re Marriage of Smario*, No. 10-1274, 2011 WL 2089593, at *1 (Iowa Ct. App. May 25, 2011). The court ordered a property equalization payment of $279,888 to be paid by Jeffrey to Shirley. As a part of the property distribution, Shirley will receive $80,000 in immediately available cash and $160,000 deposited into an IRA, as well as $500 monthly payments until the property judgment is fully satisfied. Shirley also received inherited funds of $24,000, which are currently held in a bank account. Shirley's IPERS and Jeffrey's pension were equitably divided under the *Benson* formula. *See In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996). The extent of debt assigned to Shirley is post-separation credit card debt of approximately $8000. The parties' residence was also ordered to be sold, with the proceeds divided equally between the parties subject to payment of expenses and mortgage,

---

[5] The court ordered a property distribution equalization payment in the amount of $279,888. The payment was to be satisfied as follows:
1. $40,000 cash by January 15, 2020;
2. Prompt execution of a QDRO, prepared by [Shirley's] counsel, for the transfer of $160,000 from [Jeffrey's] 401(k) to an Individual Retirement Account (IRA) set up by [Shirley] to receive those funds;
3. $40,000 from [Jeffrey's] share of proceeds from the sale of the marital homestead . . . ; and
4. Installment payments of $500 on the 15th day of each month, beginning February 15, 2020, and continuing until the property judgment is fully satisfied.
As explained in section III.B below, we reduce the equalization payment by $1750.

and payment to Shirley of the first $40,000 of Jeffrey's share to be applied toward Shirley's property settlement.

Finally, although future retirement often raises too many speculative issues to be productively considered at the time of an initial spousal support award, we note that the parties' retirement benefits have been equitably divided per the *Bensen* formula. *Gust*, 858 N.W.2d at 416. Therefore, it would seem any postretirement support obligation placed on Jeffrey will be drawn from assets already equitably divided, and the payments received by Shirley could be considered cumulative. *See In re Marriage of White*, 537 N.W.2d 744, 747 (Iowa 1995) (affirming the district court's denial of spousal support where a substantial disparity in income existed but the parties' retirement benefits were divided through property distribution).

We believe Shirley is capable of self-support at "a standard of living reasonably comparable to that enjoyed during the marriage," and the award of traditional spousal support is inequitable given the circumstances. *See* Iowa Code § 598.21A(1)(f). We find it equitable to shorten Jeffrey's spousal support obligation as Shirley has an opportunity to become self-sufficient. We modify the duration of the spousal support of monthly payments of $1000 to terminate after a period of five years.

### B. Property Division

At the time of trial, the parties lived separately. When they separated, Shirley took only her clothing and personal belongings with her, leaving Jeffrey in the marital home with much of the personal property acquired during the marriage. The parties agreed that because Shirley was not interested in possessing any of

the household property, Jeffrey could keep the remaining contents of the home and account for the disparity through the equalization payment. Jeffrey's submitted financial affidavit values the household contents at $8000. Shirley's financial affidavit values the household contents at $3500 with a footnote denoting that the "parties have divided personal property—[Jeffrey] has difference in value."

At trial, both parties acknowledged they reached an agreement regarding personal property division. Shirley's counsel explained, "[Shirley] [doesn't] really want anything out of there, but [Jeffrey] should have at least $3,500 attributed to [Jeffrey] retaining marital assets," and Jeffrey's counsel confirmed that "we're okay saying that [Jeffrey] got $3,500 in excess of what [Shirley] received." The district court clarified the parties' agreement asking Shirley's counsel the following:

> Q. . . . Are you asking that the $3500 be put on Ms. Flaherty's side of the ledger, or are you saying $3500 is the value of all of the personal property? . . . . A. What she, I think, has testified is she's not interested in going back in and picking out couches and chairs, and I think clearly he has more by way of personal assets because she left with clothes and not a heck of a lot else. We also understand that—
>
> Q. I get that. I just don't know if I should value—if I put on her side of the ledger 3500 or 1750. A. Our suggestion is he keeps what he got. She keeps what she's got. He's gotten 3700—or whatever I said—more—3500 more by way of assets than she got...

The court's decree stated:

> Each party will retain the personal property and household belongings in her or his possession. . . . The parties agree that [Jeffrey] is retaining more personal property and household belongings than [Shirley] is, and that an additional $3500 should be awarded to her in the property distribution to account for this disparity. The court approves that agreement.

Jeffrey contends the district court valued the remaining household contents at $3500, considering them shared marital property and asks that a reduction of

$1750 be made to the equalization payment to account for his one-half interest. We agree that a reduction of $1750 should be made to the equalization payment. The record establishes that this is what the parties agreed to concerning their personal property. We modify the district court's order with respect to the property distribution by reducing the amount owed to Shirley by $1750.

### C.     Qualified Domestic Relations Order

The district court found that $276,388 should be transferred from Jeffrey to Shirley to equalize their property distribution. To effectuate the transfer, the district court used, among other things, Jeffrey's 401(k) plan as a funding source. The court ordered for "prompt execution of a QDRO, prepared by [Shirley's] counsel, for the transfer of $160,000 from [Jeffrey's] 401(k) to an Individual Retirement Account (IRA) set up by [Shirley] to receive those funds."

At the time of trial in July 2019, Jeffrey's 401(k) plan had a value of $270,404. At the time the QDRO was filed in March 2020, some of the assets held in Jeffrey's 401(k) plan had decreased in value due to the market decline caused by the COVID-19 pandemic.[6] Jeffrey asked the court to revise its order to reflect the recent downturn in the market, asserting that the $160,000 payment funded by the 401(k) and effectuated through the QDRO was intended to divide the assets

---

[6] The QDRO was entered on March 10, 2020. After filing a motion for a revised QDRO, the district court vacated the QDRO and set the matter for hearing. Jeffrey submitted an account summary for his 401(k) dated March 26, 2020. Jeffrey attributes a decrease in value of $22,000 to his 401(k) plan due to the decline in market price of stocks held in his portfolio. He states, "[the] plan dropped from approximately $270,404 to $263,167 even though Jeffrey had contributed an additional $15,000.00 to this plan after the date of the trial. Therefore, the overall decline in this account which occurred post-trial and pre-QDRO was approximately $22,000.00."

of Jeffrey's 401(k) equally between the parties and thus the payment amount should be modified to reflect the plan's current value. The district court responded,

> The court is put in the position of interpreting its own decree and Rule 1.904 ruling. Although it would not be the case for many of the divorces this court has presided over, I do actually remember my reasoning and intentions as to [Jeffrey's] Kraft/Heinz 401(k) and the related qualified domestic relations order.
>
> Unlike many QDROs, the QDRO in this case was intended only to be the vehicle or mechanism to effectuate part of the property equalization. A significant sum of money needed to be transferred from [Jeffrey] to [Shirley] to achieve an equitable division of their marital estate. Because there were not correspondingly significant sums of liquid assets outside of tax-advantaged retirement accounts, this court devised a scheme of transfer that accessed a number of money sources and would hopefully leave the parties on more equal terms as far as cash for the short-term and retirement assets for the long-term.
>
> The court did not intend what Jeffrey now argues: that the 401(k) was to be divided by Benson formula or, in fact, any formula. The intention was that the 401(k) would be one of the several sources of sums certain. And the QDRO was only the vehicle or mechanism to get that transfer made. The court valued the marital estate as of the date of trial and ordered how it would be satisfied. To reduce the amount of money [Shirley] would now get would effectively re-value the marital estate as of today's date or would constitute a modification of the property division.

The record establishes that the 401(k) plan was to be used simply as a funding source to effectuate a portion of the property distribution. The district court considered the value of the plan at the time of trial and ordered a sum certain amount, $160,000, of the equalization payment to be funded from the plan. The court correctly considered the values of the asset at the time of trial. *See In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007) ("The assets should then be given their value as of the date of trial. The purpose of determining the value is to assist the court in making equitable property awards and allowances." (citations and internal quotation marks omitted)).

The district court addressed Jeffrey's argument and confirmed its intention that the 401(k) was to be treated as a source of funding for a portion of the equalization payment in a sum certain. That certain securities decreased in market value subsequent to the decree does not change the original intent of the order and does not warrant alteration where the transfer ordered was a sum certain and contemplated as a portion of the equalization payment calculated based on the values of the assets at the time of trial. *See In re Marriage of Veit*, 797 N.W.2d 562, 565 (Iowa 2011) (affirming the district court's enforcement of a decree's language ordering payment in an amount certain despite the parties' incorrect understanding of tax consequences at the time of entering the initial QDRO and in allowing reformation of the QDRO or utilizing other assets to accomplish payment); *In re Marriage of Brown*, 776 N.W.2d 644, 650–53 (Iowa 2009) (looking to decree to find original intent as to how pension should be distributed through later QDRO); *In re Marriage of Kalkwarf*, No. 02-1309, 2003 WL 21230413, at *3 (Iowa Ct. App. May 29, 2003) (finding the payment of cash installments as a part of property distribution equalization equitable).

We find the overall property distribution equitable under the circumstances and affirm the district court's use of the 401(k) as a funding source for a portion of the equalization payment in the amount of $160,000.

### D.      Trial Attorney Fees

The district court ordered that Jeffrey contribute $3000 towards Shirley's attorney fees. Jeffrey asks that each party pay their own attorney fees. An award of attorney fees is not a matter of right, but rests within the court's discretion. *See In re Marriage of Kern*, 408 N.W.2d 387, 390 (Iowa Ct. App. 1987). The court

should make an attorney fee award that is fair and reasonable in light of the parties' financial positions. *See Miller*, 532 N.W.2d at 163. To overturn an award, the complaining party must show the trial court abused its discretion. *See In re Marriage of Gonzalez*, 561 N.W.2d 94, 99 (Iowa Ct. App. 1997). Upon our review, we do not find the district court abused its discretion and affirm the award of attorney fees.

### E.     Appellate Attorney Fees

Finally, Shirley requests an award of appellate attorney fees. Appellate attorney fees are awarded upon our discretion and are not a matter of right. *See In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). When considering whether to exercise our discretion, "we consider 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013) (quoting *Okland*, 699 N.W.2d at 270). Given consideration to these factors, we decline to award appellate attorney fees.

## IV.     Conclusion.

Upon our de novo review, we find it equitable to affirm the award of spousal support but modify its duration. We reduce the property equalization payment owed to Shirley by $1750 to reflect the agreement recited on the record as it pertains to the division of personal property. We affirm the other provisions of the dissolution decree, including the approval of the QDRO and award of attorney fees. We decline to award appellate attorney fees to Shirley and tax costs of the appeal, if any, to Jeffrey.

**AFFIRMED AS MODIFIED.**