In re the MARRIAGE OF W. P. HITCH-
COCK and Necia A. Hitchcock.

Upon the Petition of W. P.
Hitchcock, Appellee,

And Concerning Necia A. Hitchcock,
Appellant.

No. 65452.

Supreme Court of Iowa.

Aug. 26, 1981.

Rehearing Denied Sept. 17, 1981.

Richard A. Malm of Dickinson, Throck-
morton, Parker, Mannheimer & Raife, Des
Moines, and Michael J. Galligan of James &
Galligan, P. C., Des Moines, for appellant.

John A. Templer, Jr., of Davis, Hocken-
berg, Wine, Brown & Koehn, Des Moines,
for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, McGIVERIN, LARSON, and SCHULTZ, JJ.

REYNOLDSON, Chief Justice.

In this marital dissolution case the trial court divided the parties' property sixty percent to the husband and forty percent to the wife, but denied alimony to the wife due to "the adequate property settlement." The wife, respondent Necia A. Hitchcock, appeals from these and other decree provisions. The husband, petitioner W. P. "Pat" Hitchcock, filed a cross-appeal, *inter alia*, from trial court's valuation of stock in a closed corporation. We affirm in part, reverse in part, and remand with directions.

These parties were married December 10, 1947. The marriage was dissolved August 19, 1976. In *In re Marriage of Hitchcock*, 265 N.W.2d 599, 607 (Iowa 1978) (*Hitchcock I*), we set aside portions of the decree "dealing with the distribution of the assets of the parties and the maintenance of Mrs. Hitchcock" and remanded, but did not disturb the dissolution decree. This appeal and cross-appeal challenge rulings in the November 1979 trial of the economic issues on remand.

Our review is de novo. In order to equitably determine these parties' financial or property rights, we apply the general formula announced in *Schantz v. Schantz*, 163 N.W.2d 398, 405–06 (Iowa 1968), as modified in *In re Marriage of Williams*, 199 N.W.2d 339, 345 (Iowa 1972) (fault for breakdown of marriage eliminated from *Schantz* factors).[1] *E. g., In re Marriage of Callenius*, 309 N.W.2d 510, 514 (Iowa 1981); *In re Marriage of Williams*, 303 N.W.2d 160, 165 (Iowa 1981).

Pat is sixty-one years old and generally in good health. He has high blood pressure that is under control and receives treatment for allergies. As a result of service in the Marine Corps during World War II, Pat has a minor health problem for which he receives disability income of $44 a month from the Veterans' Administration. How-ever, his health has had no adverse effect on his ability to earn an income.

Pat is a high school graduate and attended Saint Thomas College for one year. After his discharge from military service, he began employment with A. E. Staley Manufacturing Company as a salesman in 1946, continuing until 1948. In November 1948 he was hired as a salesman by Davis Marketing. His duties were to call on retail stores and sell products represented by Davis Marketing as broker. In 1951 he transferred to Davenport where he organized a separate Davis Marketing division. Pat prospered and moved up to the top of the corporate ladder. Ultimately he became president and principal stockholder of Davis Marketing Co., Inc. (Davis Marketing), a position he continues to enjoy.

Necia is sixty-eight years old (seven years older than Pat), has a high school equivalency certificate, and has taken some college level courses. Prior to the marriage, she was in the Marine Corps and after her discharge worked in a record store. Necia was not employed when she and Pat were married and she did not work outside the home during the marriage.

During the nearly thirty years of their marriage, Pat devoted himself almost exclusively to achieving success at Davis Marketing. Necia remained home, maintained the household of the parties, and suffered through several miscarriages. In 1951 she gave birth to a child, Bridgett. Necia reared Bridgett and otherwise helped Pat achieve his career objectives unimpeded by family considerations.

Pat's career demanded substantial travel. Often he was absent from home on important family occasions. His employment involved moving from Des Moines to Omaha in 1948, back to Des Moines the same year, to Davenport in 1951, and back to Des Moines in 1965. In each of the homes occupied or owned by the parties, Necia made substantial improvements such as making

---

1. Section 598.21(1), The Code 1981, enacted in 1980 and inapplicable here, provides statutory criteria for property division.

curtains and painting. She testified that she never hired such work done until 1973, when the parties had a sizable net worth.

The record reflects these parties considered their marriage a joint undertaking. For example, when Necia received a substantial sum as a result of a personal injury claim, she gave this money to Pat to enable him to attend a veterans reunion in Japan and the Philippines.

As chief executive officer and majority owner of Davis Marketing, Pat earns a large direct and indirect income. His direct income as reported for tax purposes in the calendar years 1970 through 1978 is summarized as follows.

| | Gross Income | Adjusted Gross Income (W/O Excluding Alimony) | Adjusted Gross (After Alimony) |
|---|---|---|---|
| 1978 | $121,831 | $117,416 | $95,816 |
| 1977 | 102,172 | 96,213 | 74,611 |
| 1976 | 87,229 | 82,360 | |
| 1975 | 78,034 | 73,760 | |
| 1974 | 66,952 | 62,204 | |
| 1973 | 53,974 | 50,019 | |
| 1972 | 53,865 | 50,513 | |
| 1971 | 44,936 | 41,910 | |
| 1970 | 45,003 | 41,704 | |

In addition to a salary and bonuses, Pat also receives a valuable package of fringe benefits. These include: (1) medical and dental plans; (2) term life insurance in the amount of $150,000; (3) a pension plan, which at trial time would allow him retirement benefits of $1600 per month at age sixty-five; (4) a profit sharing plan through which he had accumulated about $42,000; (5) the expense paid use of a late model Cadillac automobile (he pays $35 a month for personal use); and (6) an expense allowance of $500 per month. He testified most of his expenses were charged on a company credit card.

Since their separation, Necia's income has been derived almost exclusively from Pat's court-ordered payments. Her income in 1976 was $6,062; in 1977, $21,730; and in 1978, $21,626. Necia has no present earning capacity nor a reasonable likelihood of achieving any measurable earning ability, in view of her background, education, and age. Her support, pursuant to the original decree of August 1976, was $1,500 per month. On April 16, 1979, the temporary support was increased to $1,700 per month. In addition, Pat has been paying the mortgage on the residence occupied by Necia.

## I. *Property Division.*
### A. *Valuation Date*

■ Pat argues the marital assets should be valued, and the property distribution and alimony determined, as of August 1976, the date of the dissolution decree. The trial court valued the assets as of November 1979, the date of the trial after remand.

In *In re Locke*, 246 N.W.2d 246 (Iowa 1976) (*Locke I*), we held "the date of trial is the only reasonable time at which an *assessment* of the parties' net worth should be undertaken." *Id.* at 252 (emphasis added). Pat contends that here, as in *Locke I*, we did not alter the dissolution decree, thus the first trial date is the required valuation date. It is true the appendix filed in *Locke v. Locke*, 263 N.W.2d 694 (Iowa 1978) (*Locke II*), shows that the farmland involved was appraised for the date of the dissolution trial. However, a valuation-date rule for dissolution cases was not promulgated in *Locke I*. The relevant issue in *Locke I* was whether an inherited tract of farmland should be considered in the property division. *Locke I*, 246 N.W.2d at 251–54. In *Locke II* the parties stipulated the value of the farmland. *Locke II*, 263 N.W.2d at 694. The issue whether this *valuation* date was proper was not raised. Therefore, these cases are not controlling here. Nor is it appropriate for this court to develop a general rule concerning valuation dates in disjointed dissolution proceedings, when property settlements are within this court's equitable jurisdiction.

In this case there was no "first trial" concerning the marital assets in the sense that a court received and weighed evidence of the value of the marital assets, made findings of fact, and formed conclusions of law. Pat was the only witness in the half-day proceeding. His testimony was not completed when, during a recess, the trial court induced the settlement we later set aside. *Hitchcock I*, 265 N.W.2d at 600, 602,

607. We observed "the decree in this case is not the result of a trial on the merits or an independent decision of the court." *Id.* at 605. Consequently, the remand proceeding was the first judicial determination of the marital assets subject to distribution and their value. Curiously, Pat acquiesced in the 1979 values of all assets but the Davis Marketing stock. He makes no objection to the inclusion of a sailboat and trailer as marital assets, despite the fact he bought them *after* the divorce decree.

If, following the 1976 dissolution, there had been an actual distribution of common stock in a public corporation, either party would have been free to sell or retain such property. The resulting loss or gain of one party due to fluctuating stock values would not affect the interest of the other. Here, however, there was no distribution. If we were to adopt Pat's argument, he would benefit by three years' appreciation in Davis Marketing stock while Necia would merely receive the legal rate of interest on her share.

We hold that here equity and logic dictate we approve the trial court's decision to value the marital assets as of November 1979.

### B. Value of Stock

■ The parties' net worth is central to this appeal. They disagree on the value of their principal marital asset, 8,285 shares of Davis Marketing. These shares, standing in Pat's name, constitute more than eighty percent of Davis Marketing's outstanding stock. Pat's expert put their worth on December 31, 1978, at between $260,729 and $298,674. Necia's two experts valued this stock at $2,183,428.90. On cross-examination, rather effective attacks were made on the experts by counsel for both parties. The variety and complexity of the appraisal techniques the experts used in reaching their irreconcilable valuations prompted the trial court to find the appraisals "serve to confuse as well as to inform." Consequently, the trial judge devised his own valuation method.

In late December 1971, Davis Marketing contracted to pay $400,400 for eighty-two percent of its outstanding stock from then principal owner John W. Davis. This maneuver, guided by Pat, left over eighty percent of the outstanding stock in his name. Finding Pat to be "an astute businessman," the court determined it was "inconceivable" Pat would agree or have his company agree to pay "any more than was absolutely necessary" for the John W. Davis stock. Using the buy-out figure as a base, the trial court allowed for growth and inflation and fixed the value of the "Davis stock" as of "this date" at $1,000,000. However, when summarizing the property division, the trial court listed the value of the "Davis stock" held by Pat at $800,000. Necia did not raise this inconsistency in trial court in her post-trial motions. In their appellate brief and at oral argument, counsel for Necia contended trial court "incorrectly reduced the value of the Davis Marketing shares owned by Mr. Hitchcock by a 20% factor, even though it had previously taken the 80% ownership in the Company into consideration."

We agree this was a mistake. The trial court apparently found the value of Pat's Davis Marketing stock to be $1,000,000 and meant to use that figure when calculating the total value of marital assets and when allocating the property division between the parties. The $1,000,000 valuation fixed by the trial court was fully justified and we independently so find it. Since 1970 Davis Marketing's gross brokerage commissions have grown 137 percent from $944,240 per year to $2,238,478 per year. Its staff has grown from forty in 1970 to eighty-three employees at the time of the 1979 trial. Although Pat's counsel argues a food brokerage firm is "essentially a service organization" with "little or no tangible assets," Pat's expert testified Davis Marketing had tangible assets of $295,146 at the end of 1978. The record reveals that Davis Marketing is a stable, well-managed company with a good profit record. Finally, we note the uncontroverted testimony of Necia that in 1971, when the company redeemed the stock of John W. Davis for $400,400, her

husband told her he had acquired a company worth a million dollars.

Because we find the value of the Davis Marketing stock in Pat's name to be $1,000,000, we accordingly modify the property distribution award. Our review of the record persuades us the award also must be modified to reflect: (1) The award to Pat of life insurance with cash value of $12,204; (2) Pat's $5,000 equity in a new home, a down payment which was made in 1979 with cash subject to distribution; and (3) the award to Pat of the coin collection the trial court found worth $1,000, but which the court charged to Necia's share.

We have considered all other challenges the parties make to the property distribution, but we are convinced the trial court's award should be affirmed in every instance. We are satisfied trial court carefully considered the *Schantz* criteria in concluding a property division of sixty percent to the petitioner and forty percent to the respondent was equitable, after first setting aside to Pat his profit sharing entitlement of $42,000 and the present value of his retirement benefits.

In summary, we offer this restatement of the property division.

| | Value | Presently Possessed By Pat | Presently Possessed By Necia |
|---|---|---|---|
| Residence (Net Value) | $ 72,000 | ---- | $ 72,000 |
| Household Goods | 12,000 | $ 4,000 | 8,000 |
| 1968 Chevrolet | 500 | 500 | ---- |
| 1973 Mustang and 1964 Olds | 2,000 | ---- | 2,000 |
| Cash Assets | 6,000 | 6,000 | ---- |
| Benquet Stock | 3,638 | 3,638 | ---- |
| AIMS (Net Value) | ---- | ---- | ---- |
| Coins (Remainder) | 1,000 | 1,000 | ---- |
| Sailboat and Trailer | 15,000 | 15,000 | ---- |
| Davis Marketing Stock | 1,000,000 | 1,000,000 | ---- |
| Life Insurance | 12,204 | 12,204 | ---- |
| New Home Equity | 5,000 | 5,000 | ---- |
| | $1,129,342 | $1,047,342 | $ 82,000 |

| | | |
|---|---|---|
| Necia now has: | | $ 82,000 |
| Necia received in property settlement before 1976 decree was reversed: | | 10,000 |
| | | $ 92,000 |
| Total value of marital assets: | | $1,129,342 |
| | | x .40 |
| Necia's forty percent share: | | $ 451,737 |
| Necia has received: | | − 92,000 |
| Balance due Necia: | | $ 359,737 |

The trial court ordered Pat to pay the noncontingent lump sum property award in 120 equal monthly installments. It directed Pat to pay interest of eight percent per annum on the unpaid principal. Because we have increased the award to Necia, we extend the installment repayment period to twelve years. Pat shall pay Necia 144 equal monthly installments, to include principal and interest, in amortizing the above award. We affirm the other decree terms as to the property division, including the lien against Pat's Davis Marketing stock and the prepayment provisions.

## II. *Alimony.*

■ When determining the appropriateness of alimony, the trial court must consider: (1) the earning capacity of each party, and (2) present standards of living and ability to pay balanced against relative

needs of the other. *Schantz*, 163 N.W.2d at 405.

The trial court found "Mrs. Hitchcock has no present earning capacity and in view of her background, education and age, no reasonable likelihood of achieving any measurable ... earning capacity." The court acknowledged that since the parties separated Necia's exclusive means of support has been court-ordered payments from Pat. On the other hand, the court determined Pat earns "very substantial direct and indirect income," as chief executive officer and majority shareholder of "a well established" and "extremely prosperous enterprise."

Nevertheless, the trial court ruled "that because of the adequate property settlement that will be paid to [Necia] over the next ten years, additional alimony is not required or warranted." The court ordered Pat to pay Necia $3,264.46 per month for 120 months. In modifying the property division, we increased the amount and duration of these monthly payments to Necia. However, this does not dispose of the alimony issue.

■■ Although property rights and alimony may be closely related, they are distinguishable and have differing purposes. *In re Marriage of Murray*, 213 N.W.2d 657, 659 (Iowa 1973). Division of property is based on each marital partner's right to a just and equitable share of the property accumulated as the result of their joint efforts. *Knipfer v. Knipfer*, 259 Iowa 347, 353, 144 N.W.2d 140, 143 (1966). Alimony is an allowance to the ex-wife in lieu of the husband's legal obligation to support her. *Id.* at 352, 144 N.W.2d at 143.

■ The financial statements Necia filed with the trial court suggest most of the monthly property installments to her will be consumed as received for living expenses. Pat objects that at least part of these living expenses are attributable to Bridgett, the adult daughter who resides with Necia. The record reflects Bridgett has sustained large medical bills and has had consultations with a psychologist. Necia asserts little of the household expense is attributable to Bridgett, who, after all, is also Pat's daughter. Further, Pat's financial statement was inflated by thousands of dollars of monthly expenses he voluntarily assumed as a result of his 1979 marriage to a woman with three teenage children. Among the expenses Pat claimed were a $990.30 mortgage payment (for a $138,000 house), $600 per month for "household supplies and groceries," and $300 per month for children's allowances.

Under trial court's decree, Necia was awarded the Hitchcock residence. At the end of the twelve year property distribution payout period she will have a place to live, providing she retires the $16,000 mortgage and pays the taxes and maintenance. Necia then will be nearly eighty years old and assuming she has spent the distribution payments as received, she will have no income other than her social security entitlements as a qualified divorced wife of Pat. *See* 42 U.S.C.A. §§ 402, 416 (West 1974). (In his appellate brief, Pat's attorney contends Pat's monthly benefits at age sixty-five will be at least $650, according to current social security tables.) Necia will be entitled to one-half the amount of Pat's benefits, but only if she does not remarry. *Id.* § 402. Thus, she cannot enjoy the basic civil right of marriage, as Pat now does, without paying a financial penalty. *See Locke II*, 263 N.W.2d at 696.

Pat's future is brighter. At retirement his monthly income will include his social security benefits, $1,600 in pension benefits from Davis Marketing, plus the fruits of whatever deal he strikes for the sale of his controlling interest in that company.

In allowing Pat, in effect, to buy Necia's interest in the Davis Marketing stock over twelve years (at an attractive interest rate and with the right to prepay the principal), the decree requires Necia alone to bear the "ravages of inflation." *In re Marriage of Conley*, 284 N.W.2d 220, 223 (Iowa 1979).

Considering Davis Marketing's record of growth, Pat's stock interest probably will appreciate. Due to the nature of closely held corporations and federal tax laws, Pat contends "any court-ordered disposition of

[his Davis Marketing] stock would be killing the goose that lays the golden egg." Nevertheless, the payment of the property division in installments is largely for Pat's convenience and is no substitute for the alimony support to which Necia is entitled under the *Schantz* criteria.

When marriages of long duration have been dissolved, we have affirmed awards of both alimony and substantial, nearly equal property distribution, especially where the disparity in earning capacity was great. *E. g., Conley*, 284 N.W.2d at 223; *In re Fenchel*, 268 N.W.2d 207, 210 (Iowa 1978). This passage from *Conley*, 284 N.W.2d at 223, is illustrative:

> John's income from his veterinary practice approximated $40,000 per year . . . . His alimony obligation [$500 per month] is relatively modest. It provides no basis for tempering the trial court's goal of an approximately equal division of property.

We hold that Pat shall be required to pay $1,000 alimony per month to Necia until her remarriage or death, or his death.

III. *Attorney Fees.*

■ Trial court awarded Necia attorney fees of $16,000 for the remand proceedings. She requests an additional award in connection with this appeal. On cross-appeal, Pat argues he paid more than $16,000 for Necia's attorney fees and expenses in the first round of litigation, and that he should not be penalized further.

Our modifications of the property division and alimony award equip Necia to pay her own attorney fees. *See Craft v. Craft*, 226 N.W.2d 6, 9 (Iowa 1975). We set aside trial court's award of attorney fees and deny Necia's application for attorney fees on appeal.

All court costs at trial and on appeal are taxed to Pat.

The judgment of the trial court is affirmed in part and reversed in part. This case is remanded for judgment in accordance with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.