# IN THE COURT OF APPEALS OF IOWA

No. 24-0830
Filed March 5, 2025

**IN RE THE MARRIAGE OF JASON C. OWEN
AND ALISON A. BRINKER**

**Upon the Petition of
JASON C. OWEN,**
        Petitioner-Appellee,

**And Concerning
ALISON A. BRINKER,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Audubon County, Craig M. Dreismeier, Judge.

        A woman appeals the property division and spousal-support provisions of the district court's order dissolving her marriage with her former spouse. **AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**

        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

        Jessica A. Zupp of Zupp and Zupp Law Firm, P.C., Denison, and Julie G. Mayhall, Carroll, for appellee.

        Heard by Greer, P.J., and Langholz and Sandy, JJ.

**SANDY, Judge.**

Alison Brinker appeals the district court decree dissolving her marriage with Jason Owen. She argues the district court's property division and denial of spousal support was inequitable. Specifically, Alison contends the district court (1) undervalued the Owen family acreage, (2) failed to value certain farm equipment separately from the Accu-Steel valuation, (3) undervalued the Klocke and Klein farms, and (4) wrongly denied her spousal support. We affirm the district court's valuation of Accu-Steel. We modify the district court's denial of spousal support and award Alison spousal support consistent with this opinion. We affirm the district court decree in all other respects and remand for purposes of calculating child support.

### I. Background Facts and Proceedings

Jason and Alison have been married since 2003. Jason has some college education but left college to start a business. Alison has a bachelor's degree in accounting from the University of Northern Iowa. Her certified public accountant certification lapsed during the marriage and would require renewal if she were to work in that field again. During the marriage, the parties had two children, born in 2007 and 2009.

Jason petitioned to dissolve his marriage with Alison in September 2022. At that time, the parties had been married for over nineteen years. Jason and Alison stipulated to most childcare issues but left the court to calculate child support. All other issues were decided by the district court, including property division, spousal support, and attorney fees.

In 2001 Jason founded and is currently the president of a company called Accu-Steel, Inc., which employed eighteen people full-time at the time of trial. The value of Accu-Steel—and Jason's income from Accu-Steel—were points of dispute during trial. The district court described Accu-Steel as a company that "designs and manufactures steel frame structures and the polyethylene fabric sheeting that goes over the steel frames."

*A. Accu-Steel's Value*

Jason and Alison each provided expert appraisers to value the company. Jason's expert valued Accu-Steel at $4,391,000, and Alison's expert valued the company at $5,699,600. The analysis for Jason's expert started with 2019's financials while Alison's expert started with 2018's financials. The district court believed both experts to be experienced but found the valuations to be "flawed" due to the values only being "as good as the information provided to [the appraisers]"—recognizing that both Jason and Alison may not have provided their respective experts with the most complete picture of the company's financials. Accordingly, the district court estimated Accu-Steel's value to be $5,045,300—the average of the two experts' valuations.

One point of contention when valuing the companies was to what extent the farming equipment owned by Accu-Steel was included in the respective valuations. Accu-Steel, despite not being involved in any farming, owns a large amount of "nonessential farming equipment" used by JA Ranch.[1] JA Ranch is another one

---

[1] At trial Jason testified he believed the legal name of this company is "JA Ranch Co. LLC," but the company is referred to by several different legal names within the parties' various filings. For consistency, we refer to the company as "JA Ranch.".

of Jason's business entities that farms using the farming equipment owned by Accu-Steel and pays Accu-Steel rent for that equipment's use.

Jason's expert testified that he "[did]n't know exactly" what farm equipment was or was not used to generate income for Accu-Steel. He suggested that these assets may have been included in the depreciation schedules but testified that he "typically [does]n't go through and look through every single asset to see what [the business] included" as an operating asset or nonoperating asset. He did testify that those assets were not separately appraised. Alison's expert stated that he did not include the farming equipment in his valuation:

> Q. Now, Accu-Steel also owns farm equipment; correct?
> A. Correct.
> Q. And did you consider that farming equipment in any manner when you did this valuation? A. No. Accu-Steel is not in the business of farming. And so the farm equipment is not necessary assets to run this business and so the farm equipment is not included in our valuation.
> Q. So would that have to be valued separately? A. Yes, it would.
> Q. And all the equipment, all the farm equipment, owned by Accu-Steel would need to have a separate value placed upon it? A. Right. If we had a value, we would have added it to this schedule; but we don't have a value.

Further, the Accu-Steel valuation report provided by Alison's expert states that the farm equipment was not included in the company valuation, including any rental revenue derived from that equipment: "A hypothetical rental income, estimated at $80,000 annually, was not included in this [normalizing income] adjustment as it is our understanding that the farm equipment owned by Accu-Steel is to be considered separately or to be sold and the proceeds split between the parties."

But Jason testified on direct examination that Accu-Steel reported rental income from JA Ranch—income that the district court found both experts used in their Accu-Steel valuations:

> Q. And you were also paid rental income from JA Ranch at times; correct? A. That's correct, yes.
> Q. For that equipment? A.: Right. JA Ranch wrote a big check to Accu-Steel for it, yes.

Unfortunately, there was not testimony about the amount of the "big check.". Unfortunately, the date of the "big check" was never testified to. Unfortunately, whether Alison's expert excised the "big check" from his valuation was never testified to. The disputed farm equipment's asset-based value was itemized in trial exhibit OO. Such value was $1,027,784.91. Jason admitted that figure's accuracy and argued for the same in his post-trial brief.[2]

The district court found that both experts included the value of the farming equipment in their Accu-Steel valuation and that separately valuing it for the property division would amount to "double-counting" the farm equipment's value.

*B. The Owen Acreage*

While the parties were married, they lived on the property referred to by both as the Owen acreage. The acreage is roughly twenty-five acres in size, contained within three tax parcels. The acreage contains the family residence and the family business. Accu-Steel operates out of the property. At trial, Jason and Alison disputed the total value of the acreage. That dispute largely arose from

---

[2] Jason argued this is the book value of all equipment that had not been sold or fully depreciated. According to Jason, Alison did not account for full depreciation or items that were sold when she estimated the value of farm equipment to be $1.45 million.

their disagreement as to the value of a manufacturing building located on the acreage. Jason estimated the building is worth $75,516 (a figure provided by a certified appraiser). Alison estimated the building is worth $544,000, which she claimed is the assessed value of the building. Jason's appraiser estimated the acreage to be worth $915,000, while "Alison [took Jason's] value of $915,000 and add[ed] to it the difference between his determination of the value of the manufacturing building . . . to the assessed value."

The district court arrived at Jason's certified appraiser's estimated value, finding his testimony "credible" because he "personally viewed the [acreage]" and "provided a comprehensive comparison of other properties to that of the Owen [a]creage."

*C. The Klocke and Klein Farms*

During the marriage Alison and Jason purchased a couple of farms, which they refer to as the Klocke farm and the Klein farm. The Klocke farm, purchased in 2010 for approximately $1,000,000, consists of 140 crop acres and is located about a quarter mile from the Owen acreage. The farm is used to support a cattle-feeding operation. Jason calculated the value of the property to be $2,080,000, which was based on his analysis of comparable farm sales. Alison's expert, who was not a certified appraiser, also arrived at a value for the Klocke farm using comparable sales data. Her expert estimated the total value of the farm to be $2,718,312.

Jason's loan officer reviewed the analysis for purposes of determining whether his bank would finance a cash equalization payment to Alison based on

the value Jason provided. The loan officer testified that he believed his bank would finance the equalization payment using Jason's estimated value.

The disparate nature of the value estimates was based in large part on Jason and Alison's disagreement relating to the value of a cattle building and hay building located on the farm. Finding that "[n]either party has presented any credible evidence to support their values for these structures," the district court adopted Jason's $2,080,000 land value and then added the difference of the parties' structure values ($153,801.50) for a total valuation of $2,233,801.50. The district court used Jason's estimated land value because Jason provided his land valuation methodology while Alison's expert did not do the same.

Jason and Alison purchased the Klein farm about three years before trial, which consists of 110 total acres and ninety crop acres. This property was purchased for around $950,400 and remains highly leveraged, with about $557,000 left on the mortgage. Jason valued this property at $1,100,000 and Alison valued it at $1,541,549. The district court valued the Klein farm at $1,100,000, providing the same reasoning as for the Klocke farm (minus the dispute over building valuations).

*D. Spousal Support*

Alison requested $13,500 in monthly spousal support until she remarried or the date of either party's death. Jason argued that her request for spousal support should be denied.

Alison worked for Accu-Steel in accounting and marketing from 2006 until February 2023, earning an annual salary of $60,000. She has a few retirement accounts from accounting positions she held in the late 1990s through early 2000s.

Jason also reported a $60,000 annual salary in his role as the president of Accu-Steel. The district court found it was difficult to ascertain his true income due to the opaque recordkeeping and creative categorization of certain expenses as business expenses. Both Jason and Alison used the income figures in Jason's income calculation exhibit as the basis for estimates relating to Jason's income. But Alison used Jason's taxed "gross income" and Jason used his taxed "net income". Alison also added back various personal expenses she claims were deducted as business expenses. Alison proposed taking the average of Jason's 2020–2022 incomes while Jason proposed using 2017–2021, arguing that 2022's high figure was too "anomalous." While the district court agreed that net income was the best method for calculating Jason's income, it used the 2017–2022 period, disagreeing that 2022 should be excluded simply because Jason believed the income to be too high. This resulted in the court's determination that Jason should be imputed an annual income of $420,854.

Alison argued no income should be attributed to her, but Jason contended that she should be attributed an earning capacity of $75,000 based on her ability to find work as an accountant. Since Alison worked in accounting during the marriage and has the ability to further increase her income by renewing her CPA certification if she so chooses, the court found her earning capacity to be $69,000.

The district court found the parties' joint marital net value is $8,915,822.70. After allocating assets and liabilities, Jason had a net value of $7,490,319.10 while Alison had a net value of $1,425,503.60, resulting in a $6,064,815.50 differential. The district court then ordered a $3,032,407.70 equalization payment from Jason to Alison. As a result of the equalization payment, the district court found that

Alison would "likely" earn a seven percent rate of return, which would generate $212,269 income annually. That amount in addition to her accounting income would give her an annual earning capacity of $281,269.

Despite the $140,000 gap in earning capacity between Jason and Alison and the almost twenty-year marriage, the district court declined to award Alison any spousal support. The district court noted that Alison claimed many expenses ($25,000 per month) it had difficulty confirming, such as $6640 in farm mortgage expenses she would not be incurring.

The district court observed that Alison reported a monthly entertainment expense of $2790. The court further stated "[t]here was very little [evidence], if any, to show what this actually consists of per month on average. She notes $6400 per month representing car payments, property taxes, vehicle maintenance and professional fees. As mentioned, the vehicles in her possession are paid for . . . ."

The district court also noted that Jason would need to take out a loan to make the equalization payment to Alison. In its view "when the interest payments Jason will need to make on an annual basis are factored into the equation, any [income] discrepancy quickly disappears."

Alison now appeals.

## II. Standard of Review

We review decrees dissolving marriage de novo, *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006), including determinations of spousal support, *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023). *See* Iowa R. App. P. 6.907. "Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the

witnesses." *Sullins*, 715 N.W.2d at 247 (citation omitted). We afford the district court considerable latitude in determining spousal support, *In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022), and "should disturb the district court's determination . . . 'only when there has been a failure to do equity,'" *Sokol*, 985 N.W.2d at 182 (citation omitted).

### III. Discussion

Alison argues the district court (1) undervalued the Owen family acreage, (2) failed to value certain farm equipment separately from the Accu-Steel valuation, (3) undervalued the Klocke and Klein farms, and (4) wrongly denied her spousal support. We address each argument in turn.

Under Iowa Code section 598.21(5) (2023), the court shall divide all property, except inherited property or gifts received or expected by one party, equitably between the parties after considering the statutory factors. Although not required, *In re Marriage of Hoak*, 364 N.W.2d 185, 194 (Iowa 1985), trial courts generally strive to make the division of property approximately equal, *In re Marriage of Conley*, 284 N.W.2d 220, 223 (Iowa 1979). Property division and spousal support are contemplated in conjunction to "evaluat[e] their individual sufficiency." *In re Marriage of Dahl*, 418 N.W.2d 358, 359 (Iowa Ct. App. 1987).

### A. Accu-Steel's Farm Equipment

Alison argues that Accu-Steel's farm equipment was not accounted for in the district court's valuation of the company because neither party's expert included the equipment in their valuation. We disagree and find that the parties' experts included the income derived from the farm equipment in their respective

reports. The district court found that "both experts have considered this same equipment in valuing the business."

We agree that Jason's expert included this equipment explicitly in his valuation because that expert testified that he "[does]n't go through and look through every single asset to see what [the business] included" as an operating asset or nonoperating asset. And although Alison's expert testified that "the farm equipment is not included in our valuation," it is unclear to what extent his report expressly carved out the actual revenue produced by the equipment—the "big check." And, because such carve out would have been necessary so as to not include the farm equipment in the Accu-Steel business valuation, whether Alison's expert indeed "double dipped" is unclear on the record before us. He never testified that any of Accu-Steel's reported rental income was excised from his report. Alison's expert agreed he "d[id]n't have any knowledge about the breakout of equipment that is actually used in the Accu-Steel business versus farming equipment." While Alison's expert understood that the farm equipment was going to be valuated separately, sold, and divided equitably, such did not obviously occur.

From our seats, we cannot serve as expert appraisers, nor can the district court. We look to the information provided by the retained experts. Without clear information over how the agricultural equipment impacts the company value, we cannot remove it and add it to the property list. As it stands now, the agricultural equipment is owned by AccuSteel and if sold would follow the company. Thus, we follow the district court's careful analysis based upon what it had available to consider.

The value of the farm equipment is baked into each expert's valuation—both explicitly and implicitly. It would be impossible to value the farm equipment separately without having both experts revalue the company accordingly. The extent to which the district court's valuation of Accu-Steel was imperfect was due to no error on its part. Rather, it was due to the lack of precise record relative to the "big check." The company's financial reporting as it relates to the revenue-generating aspects of the farm equipment is opaque and not well-established by the record. Remanding for the purpose of revaluing the company and separating the farm equipment value from Accu-Steel's value would not correct any inequity done by the district court and would give Alison an opportunity at a second bite at the apple. We affirm the district court's Accu-Steel valuation and decline to separately value the company's farm equipment.

*B. Owen Acreage*

Alison argues the district court erred in valuing the Owen acreage at $915,000 and failing to increase the value by $544,140 to account for the manufacturing building on site. We disagree.

Property values "within the range of permissible evidence" are generally left undisturbed. *In re Marriage of McDermott*, 827 N.W.2d 671, 679 (Iowa 2013); *see In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007).

As the district court observed, Jason's certified appraiser actually viewed the property in person, which is not necessarily the case in a tax assessment. Alison did not have an appraiser view the premises. The district court's assessment that the manufacturing building appeared "dilapidated" is consistent with the appraiser's assessment to the same:

> The building is highly depreciated in value overall. The fabric cover is nearing the end of its useful economic life and has multiple tears. . . . Given the building's current state, the appraiser has determined that it is not financially feasible to replace the building's fabric cover and therefore, the building's vertical frame has no contributory value.

He concluded that

> There have been very few real estate sales transactions that include fabric-covered hoop buildings. Per the appraiser's research and discussions with market participants, the appraiser determined that fabric-covered hoop structures have an approximate economic life of 15-25 years and there is not a strong market demand for fabric-covered hoop buildings that are in the middle of their economic life due to rapid depreciation.

From the appraisal, it is clear that the expert gave thoughtful consideration to the building's value. Additionally, Alison's contention that the 2023 tax assessment supports her proposed valuation is not persuasive. That assessment relates to the entire parcel—not solely the specific manufacturing building at issue here. The assessment provides no itemization of individual building values. Using Alison's recommended valuation method would "effectively double-count[] the acres, the other building, and the improvements."

Alison provides no evidence that Jason's valuation is unreliable beyond countering with her own imperfect valuation. We agree with the district court on this issue and will not disturb its Owen acreage valuation.

*C. The Klocke and Klein Farms*

Alison argues the district court undervalued the Klocke and Klein farms. As with her arguments relating to the Owen acreage valuation, we defer to the district court's credibility determinations on this issue. Alison takes issue with the district court's assertion that her expert's "qualifications to value the farm ground are not

superior to Jason's." But the district court is correct; an "owner is a competent witness to testify to [a property's] market value," *Hansen*, 733 N.W.2d at 703, and her expert is not a certified appraiser. Jason also provided a more detailed analysis directly related to the farm ground's productivity. Alison's primary argument for why her expert is more credible than Jason relates to the expert's testimony that he felt "fairly comfortable giving a range for the value of the farmland." We do not find that this is a compelling argument for departing from the district court's factual findings on the value of the Klocke and Klein farms.

*D. Spousal Support*

"Spousal support is not an absolute right; rather, its allowance is determined based on the particular circumstances presented in each case" and the statutory factors in Iowa Code section 598.21A(1). *Sokol*, 985 N.W.2d at 185. The district court did not award Alison spousal support as she requested. Alison argues she should be awarded traditional spousal support—one of the four forms of spousal support recognized by our supreme court. *See generally id.* at 185–86. Traditional spousal support is "equitable in marriages of long duration to allow the recipient spouse to maintain the lifestyle to which he or she became accustomed." *Id.* at 185.

In deciding an equitable award of traditional spousal support, we give particular attention to the earning capacity of each spouse, their current standards of living, and the spouse's ability to pay weighed against the relative needs of the other spouse. *See In re Marriage of Hitchcock*, 309 N.W.2d 432, 436–37 (Iowa 1981). "The property division and the award of [spousal support] must be considered together in evaluating their individual sufficiency; they are neither made

nor subject to evaluation in isolation from one another." *In re Marriage of Grauer*, 478 N.W.2d 83, 85 (Iowa Ct. App. 1991).

The district court declined to award Alison any spousal support due to the cash equalization payment and the income it may possibly create, her lack of debt, her age and ability to support herself, and income earning potential. But we take issue with the district court's analysis in a couple of respects.

First, Alison's income from the cash equalization payment will be subject to the rising and falling tides of market performance—meaning there will be years where it may not provide the estimated seven percent return the district court assumed.[3] Such a shortfall would heavily impact Alison's ability to support her expenses and standard of living. And it could require her to draw down from the equalization payment principal to bridge the gap, which would reduce the income she could earn in the future even further. Second, the large yearly gap in the parties' earning capacities—nearly $140,000—is difficult to reconcile without an award of spousal support, especially when combined with potential years of poor market return.

There is no dispute that Alison was an equal partner in the marriage. At the time she and Jason married, she was a corporate accountant with a "greater net worth than Jason." She left that career path to support Jason's business. And although their marital assets are being evenly split, Jason's stipulated award of

---

[3] Alison is not disputing the district court's determination that she could earn a seven percent rate of return on her cash equalization payment after invested. Thus, we will not weigh in on the propriety of the district court's treatment of the cash equalization payment as an income generating asset, how much income the asset generates, or what investment vehicle is used to allow for such generation.

Accu-Steel will provide him a much larger ceiling for income growth than will Alison's accounting career. That is due, in part, to her sacrifices.

A large portion of the district court's reasoning for not awarding Alison spousal support was based in its skepticism relating to her claimed monthly living expenses, finding "her monthly living expenses are not even close to her $25,000 per month projection." And while living expenses are certainly relevant to the question of her relative needs, the district court did not give sufficient consideration to permitting her to "maintain the lifestyle to which . . . she became accustomed." *Sokol*, 985 N.W.2d at 185.

Due to some of the ongoing expenses and interest Jason may take on in order to make Alison's equalization payment, we do not believe Alison's argument that she should be awarded $13,500 in monthly spousal support to be a reasonable request. We find that Alison should be awarded $3500 per month in traditional spousal support until she remarries or either party dies, whichever occurs first. This award provides some buffer for poor market years, permits Alison to continue the lifestyle to which she is accustomed, allows for her needs to be met, and closes the gap between the parties' incomes while also leaving Jason sufficient income and access to funds to make the equalization payment.

## IV. Conclusion

We affirm the district court's valuation of Accu-Steel. We modify the spousal-support provision to award Alison $3500 in monthly traditional spousal support consistent with this opinion. We affirm the district court in all other

respects. We remand to the district court for purposes of calculating child support given Alison's award of spousal support.

**AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**