# IN THE COURT OF APPEALS OF IOWA

No. 24-0564
Filed July 23, 2025

IN RE THE MARRIAGE OF ANGELA M. STEWART
AND NATHAN D. STEWART

Upon the Petition of
ANGELA M. STEWART,
　　　Petitioner-Appellee,

And Concerning
NATHAN D. STEWART,
　　　Respondent-Appellant.
_____

　　　Appeal from the Iowa District Court for Grundy County, Linda M. Fangman, Judge.


　　　A husband appeals from the district court's partial decree dissolving his marriage with his wife, as well as its subsequent ruling on his motion to reconsider, enlarge, or amend. **AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**

　　　Stephen Babe and Marcy Lundberg of Cordell Law, LLP, Des Moines, for appellant.

　　　Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellee.

　　　Considered without oral argument by Greer, P.J., and Langholz and Sandy, JJ.

**SANDY, Judge.**

Nathan Stewart appeals from the district court's partial decree dissolving his marriage with Angela Stewart, as well as its subsequent ruling on his motion to reconsider, enlarge, or amend. Nathan contests the district court's award of spousal support and vehicles to Angela, various marital property determinations and valuations, tax liability determination on a loan taken out by Nathan, property equalization amount and payment terms, and award to Angela of a post-secondary-education subsidy. We affirm in part, modify in part, and remand to the district court for entry of an order consistent with this opinion.

## I. Background Facts and Proceedings

Nathan and Angela married in July 2003. At the time of the dissolution, the parties had been married for approximately twenty years. The parties were aged forty-seven years and forty-four years, respectively. Relevant to this appeal, the parties entered into a prenuptial agreement immediately prior to the marriage. That agreement provided that the parties "shall retain individually the title, management and control of all property [then] owned or [thereafter] acquired by each." And while the agreement also provided that the parties may freely distribute their "separate property by sale, transfer, gift or will," it was silent as to whether the proceeds or value at the time of transfer should be retained by the respective party. In the attached list of assets and liabilities, Nathan credited himself with $36,000 in cash, stocks, and bonds, $10,000 in "[a]utomobiles," $25,000 in "farm machinery and tools," and $74,000 in "[g]rowing [c]rops." He claimed $70,000 in debt for "[n]otes due to banks." Angela claimed $12,000 in cash, stocks, and bonds, $15,000 in "[a]utomobiles," and declared debt of $11,000 in "[n]otes due to banks."

During their marriage, the parties had three children aged eighteen, seventeen, and fourteen at the time of dissolution. They jointly own several tracts of farmland, as well as a couple rental properties and the family home. Angela has a bachelor's degree and was a teacher at the time that she married Nathan. Nathan is a corn and soybean farmer, a career in which he has been very successful. As a result of that success, Angela was able to step away from her career and care for the children, including homeschooling for about four years, and remained a homemaker. The parties separated in July 2022 and Angela filed for divorce. Upon their separation, Angela began working in Dike-New Hartford Community School District as a paraprofessional, making approximately sixteen dollars per hour.

Although she is currently working in education to support herself, Angela does not wish to return to full-time teaching. Since she would need to take classes to renew her teaching license, she would prefer to pursue alternative education in the area of photography or graphic design. She has worked as a photographer while separated from Nathan and could complete a photography degree in about two years while simultaneously continuing her educational paraprofessional work.

Following Angela's dissolution petition, the district court entered a temporary matters order in January 2023. The dissolution trial was held December 6 and 7. The district court entered its dissolution decree in February 2024. Nathan filed a motion to reconsider, and the district court denied that motion in its entirety in March.

Nathan now appeals.

## II. Standard of Review

Our district courts try marriage dissolutions in equity, and we review equity actions de novo, *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021), including appeals of a district court's spousal support award, *In re Marriage of Ask*, 551 N.W.2d 643, 645 (Iowa 1996). But we give weight to the district court's fact findings and determinations of witness credibility. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015).

## III. Discussion

Nathan raises nine issues on appeal. We address each issue in the order he raised them in his brief.

### 1. Spousal Support

The district court awarded Angela temporary spousal support in "the amount of $5000 per month until the above property settlement is paid in full. Alimony shall then decrease to $1000 per month for the next two years." Nathan first argues the district court erred in awarding temporary spousal support to Angela because "the property division scheme solely assigns liabilities to [him]" and will increase his tax burden, "Angela [was] awarded a substantial amount of assets from the marital estate," including "income producing land," Angela has an inheritance not included in the marital estate. He contends all spousal support should be eliminated.

"Spousal support is not an absolute right; rather, its allowance is determined based on the particular circumstances presented in each case" and the statutory factors in Iowa Code section 598.21A(1) (2022). *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023). There are several types spousal supports a court may consider, including rehabilitative support, which "serves to support an

economically dependent spouse through a limited period of education and retraining," reimbursement support, which "is predicated upon economic sacrifices made by one spouse during the marriage that directly enhance the future earning capacity of the other," *In re Marriage of O'Rourke*, 547 N.W.2d 864, 866–67 (Iowa Ct. App. 1996), as well as traditional support, which is "equitable in marriages of long duration to allow the recipient spouse to maintain the lifestyle to which he or she became accustomed," *Sokol*, 985 N.W.2d at 185. Courts may also consider transitional support, which may provide support in the "transition from married life to single life." *In re Marriage of Pazhoor*, 971 N.W.2d 530, 540 (Iowa 2022). The court may also consider a hybrid of the above forms of support where warranted, including when "necessary for [the recipient spouse's] new career to develop to the goal of self-sufficiency." *See In re Marriage of Colby*, No. 22-0697, 2023 WL 5091835, at *2 (Iowa Ct. App. Aug. 9, 2023) (citation omitted).

In deciding an equitable award of spousal support, we give particular attention to the earning capacity of each spouse, their current standards of living, and the spouse's ability to pay weighed against the relative needs of the other spouse. *See In re Marriage of Hitchcock*, 309 N.W.2d 432, 436–37 (Iowa 1981). "The property division and the award of [spousal support] must be considered together in evaluating their individual sufficiency; they are neither made nor subject to evaluation in isolation from one another." *In re Marriage of Grauer*, 478 N.W.2d 83, 85 (Iowa Ct. App. 1991).

Nathan had average annual earnings of $310,702.25 from 2019 to 2022. And in the prenuptial agreement, he reported his salary shortly before marrying Angela at $18,000. This indicates an exponential growth in earnings that occurred

during the marriage. By contrast, Angela reported a $25,000 salary in 2003 and currently makes $22,473 a year.

Alison was an equal member of this twenty-year marriage, and her contributions, particularly her agreement to leave her career for childcare and homemaking, enabled Nathan to focus on farming and become the high earner he is today. No doubt, Nathan has worked hard and "is gone most of the day every day working on the farming operation," but Angela has worked hard as well and helped him raise three children while he was farming.

The district court indicated it was awarding a hybrid of "transitional/rehabilitative/traditional alimony." We find Nathan's argument that spousal support is not appropriate due to the "substantial amount of assets" awarded to Angela to be uncompelling. Much of the assets awarded to Angela are tied up in the property settlement, which she will not fully benefit from until it is fully paid to her. The district court decree specifically delineates that the $5000 per month spousal support payment will only continue until that property settlement is paid to her, which is equitable. The rehabilitative support, which will run for two years at $1000 per month beginning when the property settlement is paid, is also warranted and necessary. As explained above, Nathan's earning capacity has grown massively during the marriage while Angela's has stagnated. The $1000 monthly rehabilitative payment will be a sound investment allowing her to acquire the skills and education necessary to support herself in a new career field.

And as Angela noted, she has few retirement savings outside of a small IPERS account. The court found Angela credible, and she testified to using her inheritance to close the gap in her lack of retirement saving over the years. It

would be inequitable to expect her to deplete her retirement savings as income, particularly as she grows closer to retirement age.

Nathan walked away from the district court proceedings following a twenty-year marriage with only four years of spousal support and far more real estate, despite the parties' current income disparity exceeding a quarter million dollars. The spousal support provision is more than equitable to Nathan.

### 2. Crops from Prenuptial Agreement

Nathan takes issue with the following provision of the district court decree: "The last thing listed on the premarital form is growing crops in the amount of $74,000. Those crops from [twenty] years ago have long been grown and harvested and are not in consideration at this time."

At trial, Nathan testified that the prenuptial agreement only covered three tractors and a Jeep. He never provided any testimony that $74,000 of crops were in the agreement's covered items and did not raise the issue until his post-trial motion to reconsider. This is especially damaging when considering Nathan was expressly asked what was covered by the prenuptial agreement—to which he made no mention of crops. And the parties' pre-trial stipulation provided no mention of the crops outlined in the prenuptial agreement. The assets and liabilities worksheets attached to that stipulation provided no carveout from marital assets for Nathan's crops pre-dating the marriage. We would expect to find a requested $74,000 exception from the marital assets section of the pre-trial stipulation if Nathan interpreted the prenuptial agreement in the way he does on appeal. Alas, no such exception is to be found.

Moreover, Nathan's argument that the agreement's "growing crops" should include $74,000 of any currently growing crops is not convincing when the agreement also includes $35,000 of "stocks and bonds" for Nathan and $15,000 in "automobiles" for Angela—line items which the district court did not credit either party for—which Nathan does not contest. Instead, the district court only credited prenuptial items specifically identified at trial. Under the logic of Nathan's argument, "automobiles" and "stocks and bonds" should include those respective values for any currently held automobiles and stocks and bonds since the agreement does not clarify.

Because Nathan first raised the issue of the prenuptial agreement's "growing crops" in his post-trial motion to reconsider, the district court had no opportunity to determine specifically what the agreement's "growing crops" asset was meant to reference and treated the line item the same to the other unidentified line items in the prenuptial agreement assets.

It was equitable for the court not to exclude $74,000 in crops from the marital assets.

### 3. *Marital Interests in Machinery*

Nathan next argues that "the court awarded Nathan 100% of the machinery, and assigned 100% value of all machinery to Nathan, even when his father has an ownership interest in seven . . . pieces of machinery." The district court found the marital interest in the machinery to be $599,650, having excepted $30,500 from the valuation for the three tractors covered by the prenuptial agreement. Nathan contends the marital interest should only be $370,150 due to his father's ownership interest in seven pieces.

Nathan's sole argument in support of this claim is that he testified to his father's ownership and Angela did not dispute that. But the district court expressly found Nathan to not be a credible witness on asset valuation, stating that "[i]n many instances it appeared that [Nathan] was trying to undervalue his assets and inflate his obligations to reflect a different net worth. Claiming only partial ownership of the equipment at his own farm is one instance of that."

And the district court further clarified that, even aside from his testimony on the point,

> [Nathan] did not submit any receipts for any of the machinery or proof that anyone else owns any of the machinery. The machinery was all located at [Nathan]'s house and there were never any payments made to his father for use or rent of this machinery. When [Nathan's father] testified, he testified [Nathan] rents land from him to farm, and there are land rent payments made to him. However, there are no payments for machinery.

The lack of non-testimonial evidence on this issue roots determination of the result almost purely on witness credibility. The district court's finding on this issue is consistent with its credibility determination that Nathan was seeking to lower the value of assets awarded to him. Absent other evidence, we decline to depart from the district court's credibility determination on this claim and agree with its finding of the marital interest in the machinery to be $599,650.

### 4. Value of Firearms

Nathan also takes issue with the district court's decision to value the firearms at retail value rather than wholesale value and to find the .50 caliber rifle to be marital property.

We refuse to disturb the district court's valuation of marital property where its valuation was "within the range of permissible evidence." *In re Marriage of*

*McDermott*, 827 N.W.2d 671, 679 (Iowa 2013). The firearm appraisal provided to the district court contained "wholesale" and "retail" values. The district court valued the firearms at the "retail" values. Nathan does not argue that the district court departed from the appraisal values, rather that it did not use the values most favorable to him. Nathan contends that retail value should not have been used because he is not a retailer, and "[n]o one testified [the] firearms were in pristine or unused condition." With no evidence indicating otherwise, we do not see how assigning fair retail value to the rifles is not within the permissible range of evidence. We decline to change the firearm valuation.

On the issue of the .50 caliber rifle—the most valuable rifle on the list of forty-one guns—Nathan again simply argues that his testimony supports his claim that it belonged to his father. No other evidence supports that claim, and Nathan did not dispute Angela's testimony that he was "very proud" of the .50 caliber rifle, enjoyed showing it to people, and kept it in the family gun room, which she described as "basically a safe. So it's all concrete, even the ceiling, and then there's a safe door to get into it."

Lacking other evidence, we again defer to the district court's credibility determination on this issue. The .50 caliber rifle is marital property, and we will not disturb the district court's retail valuation of the gun collection.

### 5. *Value of Crops and Feed Inventory*

Nathan disagrees with the district court's valuation of "crops & feed inventory" at $771,237. Although the parties agree that 85,822.47 bushels of corn

existed, Nathan disagrees with the court's valuation of $5.00 per bushel.[1] Nathan argues the crops should be valued at $4.72 per bushel, which he claims was the per-bushel price on the date of trial. But in the month before trial, Nathan executed crop sales at $5.29 per bushel, $5.81 per bushel, $5.92 per bushel, and $6.09 per bushel. Despite those elevated sales prices, Angela conservatively estimated corn to be worth $5.00 per bushel.

The district court was well within the permissible range of evidence to make its valuation based on Angela's estimate in light of Nathan's actual crop sale prices rather than Nathan's theoretical value of unknown origin.

### 6. *Award of Vehicles to Angela*

Nathan also argues the award of the Ford Fusion and 2008 Jeep to Angela was unequitable and he should not be required to pay the costs of registration, insurance, and upkeep for those vehicles, which were awarded to Angela for the parties' children to drive.

We can quickly dispose of his protest to the vehicles being awarded to Angela. As the district court stated, "[t]he parties agreed at the time of trial that the children should each retain their vehicles. The Court accepted their agreement." Beyond his topic heading, he makes no argument as to why Angela should not be awarded those vehicles.

---

[1] Nathan also argues the district court incorrectly calculated the value of "deferred payments" and "open contracts" within the "crops & feed inventory" category. Because he failed to raise this issue before the district court in his motion to reconsider, we decline to address it here. *See Meier v. Senecaut*, 641 N.W.2d 532, 539 (Iowa 2002) ("[W]e have repeatedly said that a rule [1.904] motion is necessary to preserve error 'when the district court fails to resolve an issue, claim, or other legal theory properly submitted for adjudication.'" (citation omitted)).

And he argues that registration, insurance, and upkeep payments are not the type of financial support he should be required to provide his children. But he provides no citation to any statute or case law standing for the proposition that transportation costs are excepted from the types of support a court can order him to pay. And Nathan does not dispute that the children use these vehicles and does not suggest that he would be put into hardship by supporting his children. We decline to modify the terms of the vehicles award.

### 7. *Nathan's Loan to Pay Income Tax Debt*

According to the district court,

> The parties incurred a substantial tax bill for 2022. The parties owed $240,514 for their 2022 tax bill. This was because they showed a large income for 2022 since [Nathan], who was suffering from his alcohol problem, did not meet with his accountant as usual. . . . [The parties' tax accountant] testified [Nathan] did not appear for his tax appointment at the end of 2022. [The accountant] testified he believes the taxes could have been brought down to about $40,000 had they tax planned. However, that did not occur at this time. . . . [That accountant] has done the Stewart's taxes for approximately twenty-five years. [The accountant] did point out these taxes were all based on income that had previously been earned during the Stewart marriage. As such, the tax bill is a marital debt. [Nathan] did not tell Angela about the tax debt. Instead, contrary to the Court's order to not incur additional debt, [Nathan] took out a loan for $200,000 to pay the taxes. That loan was taken out in October of 2023, and it was due on December 1, 2023. The Court is concerned that the trial was on December 6th and 7th and [Nathan] had not paid back that loan. Another concern is that [Nathan] sold grain the same day he took the loan and did not use that sale to pay the taxes. The Court finds the tax bill of $240,514 is marital debt. The Court finds the $200,000 loan used to pay off that debt is not a marital liability since it was taken out without Angela's knowledge in [Nathan]'s name alone and was required to be paid off prior to the trial even beginning.

Nathan argues the $200,000 loan used to pay the parties' income tax burden should have been considered a marital liability. We agree. The $200,000

loan was not an incurrence of new marital debt. It was used to pay off an existing marital debt—the tax owed to the state and federal governments. We see no difference in whether Nathan paid that tax bill with a loan or crop proceeds, especially when the tax bill was past due. Because the taxes were past due and Nathan did not know what amount of crop proceeds he would yield in the immediate future, we find it reasonable for him to have paid the debt with loan proceeds. Although Angela accuses Nathan of "pocket[ing] the income from selling the grain," we find no evidence in the record suggesting he hid those proceeds from the court.

But we find that it would not be equitable to Angela to evenly divide this $200,000 debt between the parties. The district court found, and we agree, that Nathan's failure to diligently plan for taxes in 2022 created a $240,514 tax burden that year—raising the parties' tax burden for the year by about $200,000 more than they should have owed. So the entire $240,514 tax burden is a marital debt. And although we agree with Nathan that the tax loan is part of that marital debt, we also agree with the district court that he should be fully responsible for paying any balance owed on that loan. We affirm the portion of the district court's decree holding Nathan responsible for the entirety of the $200,000 tax loan.

### 8. Property Equalization and Settlement Payments

The district court's decree provided

[Nathan] shall pay a settlement equalization payment to Angela of $1,329,649.70. [Nathan] shall make a first payment of $250,000 by June 1, 2024. [Nathan] shall make a second payment of $250,000 by October 1, 2024. [Nathan] shall make a third payment of $250,000 by February 1, 2025. [Nathan] shall make a fourth payment of $250,000 by June 30, 2025. [Nathan] shall make a fifth

payment of $250,000 by October 30, 2025. The balance due shall be paid by February 1, 2026.

Nathan requests we amend the property equalization amount and schedule to allow him more time to make the settlement payments and pay $1,038,314.82 total rather than the $1,329,649.70 ordered by the district court. Nathan's banker also "expressed uncertainty regarding Nathan's ability to obtain up to $500,000 in additional lending and stated that Nathan would not be able to borrow in excess of $500,000."

Because Nathan has not prevailed on any claim affecting the property equalization and settlement payments, we decline to modify the district court's decree in this respect.

### 9. *Postsecondary Education Subsidy*

The district court decree made the following conclusion of law:

The parties are currently financially supporting [the adult child] in college. The parties have agreed that each of them will pay one-third of the college expenses for [the adult child]. Both parties agree and acknowledge they will pay one-third of the college expenses for L.S. and C.S. as they arise. The Court finds this agreement is appropriate.

It also went on to decree:

3. Post secondary education subsidy: [Adult child]. Each party shall pay one-third of the post-secondary education subsidy for their [adult child]. The subsidy may be paid to the child or directly to the educational institution.

4. Post-secondary education subsidy: L.S. and C.S. It is agreed to that each party will pay one-third of the cost of the post-high school education for the benefit of L.S. and C.S. This may be paid to the child or directly to the educational institution.

"A stipulation settling an issue in a dissolution proceeding is a contract between the parties which becomes final when accepted and approved by the court." *In re Marriage of Gordon*, 540 N.W.2d 289, 291 (Iowa Ct. App. 1995).

Nathan argues this provision of the decree is contrary to the law because it does not make his postsecondary support obligation conditional under the terms of Iowa Code sections 598.21F and 598.1(8). Those sections limit the ages during which a parent can be obligated to contribute to postsecondary expenses, the total cost for which they can be responsible, and sets requirements for the child's successful and good-faith participation in such education.[2] *See id*.

We agree with Nathan. Because the district court ordered the parties to share educational expenses, and the parties' joint agreement did not dictate specific terms beyond that the "agreement was for each parent to pay a third," the district court was limited to ordering further postsecondary education within the limits of section 598.21F. The district court's order on postsecondary education did not contemplate repudiation by the children or the obligations of the children, and did not indicate that it was ordered pursuant to section 598.21F.

We modify paragraphs "3." and "4." found on page twelve of the decree to state as follows:[3]

---

[2] We note that as of July 1, 2025, section 598.21F was amended to read, "The court shall not order either of the parties to pay a postsecondary education subsidy under a temporary order or final judgment or decree." *See* 2025 Iowa Acts ch. 57, § 2.

[3] The parties filed a "joint stipulation" in the district court in October 2024, just over six months after Nathan had filed this appeal. That stipulation contained a section titled "Post Secondary Education Subsidy," which provided that the parties agreed to postsecondary education terms consistent with section 598.21F. The district court lacked jurisdiction to enter an order on the postsecondary-education-subsidy issue due to the pending appeal. *See State v. Grant*, 614 N.W.2d 848, 852 (Iowa

**POSTSECONDARY EDUCATION SUBSIDY.** Should the parties' children elect to pursue further education after high school thereby qualifying for a post-secondary education subsidy until age twenty-three as defined in Iowa Code sections 598.21F and 598.1(8) (2024), and if the parties at the time are unable to agree as to the allocation of the specified costs, either party may apply to the district court for a computation of the parties' obligation under the provisions of Iowa Code sections 598.21F and 598.1(8), as the district court retains jurisdiction to resolve any disputes that arise.

## IV. Conclusion

Thus, although we agree with Nathan that the $200,000 tax loan is a marital liability, we decline to make Angela responsible for paying any portion of the tax loan. We modify the postsecondary-education-subsidy portion of the decree to be consistent with Iowa Code sections 598.21F and 598.1(8). We accordingly remand to the district court for entry of an order consistent with this opinion. We affirm the district court's decree in all other respects.

**AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**

---

Ct. App. 2000). So we now modify the decree to largely adopt those stipulated terms in an effort to both comply with Iowa Code sections 598.21F and 598.1(8) and embody the agreement of the parties.